Kevin G. Clarkson, Esq.
Matthew C. Clarkson, Esq.
Brena, Bell & Clarkson, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
(907) 258-2000

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

SUZANNE BLAKE and CATHERINE
SCALF,

    Plaintiff,

  v.

CLASSIC ALASKA TRADING/BIG RAY'S
ALASKA, INC.,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 4:16-cv-00005-SLG

Consolidated with Case No.
4:16-cv-00014-SLG

## CLASSIC ALASKA'S MEMORANDUM IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ..................................................................................... 1

I.     OVERVIEW ................................................................................................ 1

II.    BLAKE'S JOB RESPONSIBILITIES ........................................................ 3

III.   BLAKE'S COMPENSATION ..................................................................... 8

IV.   SCALF'S JOB RESPONSIBILITIES ......................................................... 9

V.    SCALF'S COMPENSATION .................................................................... 11

LEGAL STANDARD ............................................................................................. 12

ARGUMENT ......................................................................................................... 14

VI.   BLAKE AND SCALF WERE EXEMPT EMPLOYEES WHO WERE NOT ENTITLED TO OVERTIME PAY UNDER EITHER THE FLSA OR THE AWHA ................................... 14

    A.  Blake and Scalf Were Both Exempt Executive Employees and Not Entitled to Overtime Pay. ......................................................................... 15

        1.  Legal Standard for Exempt Executive Employees. .......................... 15

            a.  Management Responsibilities. ................................................ 17

            b.  Primary Duty. ........................................................................ 17

            c.  Time Spent on Exempt Duties. .............................................. 18

            d.  Relative Importance of Exempt Duties. ................................. 22

            e.  Relative Freedom from Direct Supervision. .......................... 22

            f.  Relationship Between Salary and Wages Paid Other Employees. ............................ 24

            g.  Supervision of Two or More Employees. ............................... 25

            h.  Authority to Hire, Fire, and Promote Employees. ................. 26

        2.  Blake Was an Exempt Executive Employee. ................................... 27

        3.  Scalf Was an Exempt Executive Employee. .................................... 32

    B.  Alternatively, Blake and Scalf Were Both Exempt Administrative Employees Who Were Not Entitled to Overtime Pay. ............................... 37

        1.  Legal Standard for Exempt Administrative Employees. ................... 37

            a.  Primary Duty. ........................................................................ 37

            b.  Office Work Directly Related to Management or General Business Operations. ...... 38

            c.  Discretion and Independent Judgment Regarding Matters of Significance. ............ 39

        2.  Blake Was an Exempt Administrative Employee. ........................... 40

        3.  Scalf Was an Exempt Administrative Employee. ............................ 42

    C.  Alternatively, Blake and Scalf Are Exempt Employees Under the Combination Exemption. .......................................................................... 44

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

    D. Classic Alaska's Compensation of Blake and Scalf Did Not Violate the Implied Covenant of Good Faith and Fair Dealing. ........................................................................ 45

VII. CONCLUSION..................................................................................................................... 47

INDEX TO EXHIBITS TO MOTION TO SUMMARY JUDGMENT ............................ ATTACHED

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

# INTRODUCTION

Suzanne Blake ("Blake") and Catherine Scalf ("Scalf"), two former salaried, management level, department-head employees have sued Classic Alaska Trading/Big Ray's Alaska, Inc. ("Classic") for alleged overtime compensation that they claim they were entitled to have been paid under the Federal Fair Labor Standards Act ("FLSA") and the Alaska Wage and Hour Act ("AWHA"). Each has also sued Classic for an alleged breach of the implied covenant of good faith and fair dealing because they were not paid the overtime compensation that they claim they were entitled to receive. For the reasons detailed below, Blake's and Scalf's claims should be dismissed under Fed. R. Civ. P. 56 and Classic should be granted summary judgment against Blake and Scalf with respect to each of their claims.

Both Blake and Scalf were exempt executive or administrative employees who were paid agreed-upon salaries and who were not entitled to overtime compensation under either the FLSA or the AWHA. It was not a violation of the implied covenant of good faith and fair dealing for Classic to pay Blake and Scalf their agreed-upon salaries consistent with the FLSA and AWHA. There are no genuine issues of material fact and Classic is entitled to judgment as a matter of law against both Blake and Scalf.

# FACTUAL BACKGROUND

## I.     OVERVIEW

Classic is in the business of selling winter and Alaska appropriate clothing, equipment, and merchandise to retail customers, both private individuals and employees of companies or government entities in Alaska. Classic has five retail stores located in Fairbanks, Kodiak, and Anchorage. Rostad Dep. 10:18-24:12. Classic has been doing business in Alaska since 1947. Rostad Dep. 12:13-16. Monty Rostad ("Rostad") is the Chief Executive Officer ("CEO") for Classic. Rostad Aff. ¶ 1. Rostad is also one of the three co-owners of the company. *Id.* The other co-owners of the company, along

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment                December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG                Page 1 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 4 of 57

with Rostad, are Michael G. Miller ("Miller") and Mark D. Cruver ("Cruver"). *Id.* Rostad has held

his position with the company from 1988 to present. *Id.* Classic's owners also serve as the company's

top or executive management. *Id.* Cruver serves as Classic's President; Miller serves as Classic's Vice

President; and Rostad is Classic's Secretary. *Id.*

During the time when Blake and Scalf worked for Classic and at present, under the owners and

executive managers of the company, there were and are several middle-management positions,

including the Controller, the Information Technology Director, the General Merchandise Manager, the

Physical Inventory Control Manager, the Senior Market Manager, the Outside Retail Sales Manager,

the Fairbanks Market Manager, the Corporate Sales Manager, and the Advertising Manager. *Id.* ¶ 2.

There has also been an Embroidery department, which has fallen under the Corporate Sales Manager's

responsibility. *Id.* Each of Classic's mid-level managers control their respective departments, subject

only to the ultimate decisions of the owners and executive managers. *Id.* Each of Classic's mid-level

managers were subordinate to only (a) the owners and executive management, meaning Rostad, Miller,

and Cruver; and (b) Jesse Glamann ("Glamann"), the Senior Market Manager, who was essentially a

"head manager" who managed Classic's market managers in Fairbanks and Anchorage.[1] *Id.*

Within their respective departments, Classic's mid-level managers (a) control and manage

sizeable budgets—in the hundreds of thousands of dollars and sometimes in excess of $1 million;

(b) hire employees; (c) supervise employees; (d) discipline employees; (e) promote employees; (f) fire

employees; (g) set wage rates; (h) approve vacation time and other requested time off; (i) approve time

changes for clocked time; and (j) manage staffing. Rostad Aff. ¶ 3. The mid-level managers' authority

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

---

[1] An Organizational Chart for Classic, dated in November 2013, which reflects the hierarchy of company management as of that time, is submitted with this motion. *See* Ex. A.

over employees was not and is not limited to their respective departments, but rather extends to all employees below them. *Id.* What this means is that any mid-level manager can and sometimes does direct the activity of employees in other departments to some degree, but is expected to inform and coordinate with the particular employee's direct department manager, if it is necessary and appropriate to do so. *Id.*

## II. BLAKE'S JOB RESPONSIBILITIES

On August 27, 2013, Blake started work with Classic as its Outside Retail Sales Manager and Fairbanks Market Manager. *Id.* ¶ 4; Blake Dep. 30:21-23. Blake worked for Classic during the period of about August 27, 2013, through September 30, 2014. Rostad Aff. ¶ 4; Glamann Aff ¶ 3; Blake Dep. 30, 30:6-7. In her position, Blake reported to Glamann as Senior Market Manager and also to company ownership. Rostad Aff. ¶ 4; Glamann Aff ¶ 2-3; Blake Dep. 29. Previously, the two positions that Blake worked in had been occupied by two separate people, but Classic's owners/executive managers decided to combine the positions for Blake when she was hired. Rostad Aff. ¶ 4; Blake Dep. 38-39:14. Blake accepted the position as a salaried, exempt, management-level employee. Rostad Aff. ¶ 4; Ex. D. The salary that Blake was offered and that she accepted was $62,000 per year, plus benefits. Rostad Aff. ¶ 4; Ex. D. Although Blake has referred to her salary as "arbitrary" [Blake DK 1 ¶ 7], in truth Blake accepted the job with Classic and agreed to her salary. Rostad Aff. ¶ 4; Glamann Aff. ¶ 8; Ex. D.[2]

---

[2] Blake testified that she was originally hired as the Outside Retail Manager and was not given the combined managerial positions including both the Outside Retail Sales and Fairbanks Market departments until a short period of time after she began working for Classic. Blake Dep. 38-39. For purposes of this motion, it is immaterial whether Blake's position began or promptly evolved into a dual management/department-head position because both management/department-head positions that she held were exempt from overtime under the FLSA and AWHA.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Blake was a salaried, exempt employee who was not entitled to overtime compensation. Rostad Aff. ¶ 4; Glamann Aff. ¶ 4. Blake's job involved both office and non-manual work directly related to the management or general business operations of Classic, and managing two recognized departments within Classic. Rostad Aff. ¶ 4; Glamann Aff. ¶ 4. Blake exercised discretion and independent judgment with respect to matters of significance. Rostad Aff. ¶ 4; Glamann Aff. ¶ 4. Blake regularly directed the work of at least fifteen full-time employees within her departments, and she had the authority to hire and fire other employees, to take other personnel-related actions, and to have her suggestions and recommendations regarding such hiring and firing and other personnel-related matters given significant consideration. Rostad Aff. ¶ 4; Glamann Aff. ¶ 4.

In the position that Blake accepted, she was the manager in charge of two separate departments within Classic's organization: (a) the Fairbanks Market Department, which entails Classic's sales activity in two separate store locations in Fairbanks, Alaska—the Airport Road store location and the downtown Fairbanks store location; and (2) the Outside Retails Sales Department, which entails Classic's mail order and internet sales to customers throughout Alaska. Rostad Aff. ¶ 5; Glamann Aff. ¶ 5; Blake Dep. 40:8-14. Within her managerial position, Blake answered to Glamann as her direct superior and then also to the owners/executive management (Rostad, Miller, and Cruver), who are above Glamann. Rostad Aff. ¶ 6. Within her position, Blake managed and supervised an average of anywhere from 15-22 employees at any given time. Rostad Aff ¶ 6; Benford Aff. ¶ 6. These employees included 4-6 supervisory employees, as well as approximately 15-16 other lower-level sales clerk employees. Rostad Aff ¶ 6.

When Blake was hired, she was given a Job Description for her Outside Retail Sales-Market Manager position. Rostad Aff. ¶ 7; Glamann Aff. ¶ 6; Ex. B. Blake's written job description and her

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment                    December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG                    Page 4 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 7 of 57

actual duties performed throughout her employment included, among other things, the following responsibilities and areas of significant discretion and judgment:

- Hiring, training, and managing Web/Catalog and floor sales managers and staff;

- Setting, tracking, and achieving sales and productivity goals, and holding each group accountable for meeting goals and objectives;

- Defining and implementing standards and procedures and holding each group accountable for adherence;

- Maintaining proper standards for proper handling of inventory processed through Orders & Fulfillment;

- Implementation and management of loss-prevention strategies and processes;

- Maximizing the accuracy and efficiency of all order processing;

- Coordinating catalog and web development;

- Developing and managing an operational budget for the Outside Retail Sales Department and the Fairbanks Market; and

- Communicating, coordinating, and working with the Commercial Sales Department for the smooth and efficient operation of orders and fulfillment system.[3]

Within her position, Blake was independently authorized to, and she did, hire, discipline, fire, and promote employees. Rostad Aff. ¶ 8. Blake sometimes would consult Rostad or Glamann or ask their opinions regarding firing or laying off certain employees, but she did not need their permission or the company ownership's permission to fire or lay off an employee within her departments. Glamann Aff. ¶ 10; Rostad Aff. ¶ 8. During her first five months on the job, Blake took the initiative to clean house amongst Classic personnel working within her departments. Rostad Aff. ¶ 8; Exs. E-F, H-N. In those first five months as Manager of her departments, Blake fired a total of seven employees.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

---

[3] Rostad Aff. ¶ 7; Glamann Aff ¶ 6; Ex. B.

Classic Alaska's Memorandum in Support of Motion orummary Judgment                                    December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG                                    Page 5 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 8 of 57

Glamann Aff. ¶¶ 10-12, 14, 16-19.  In her first five months, Blake fired the following employees: Mischelle J., Trisha P., Brett B., Heather V., Ryan C., Jessica R., Teresa N.  *Id.*  Blake fired some employees and hired new employees to replace those fired employees, and other employees left of their own accord.  Rostad Aff. ¶ 8; Glamann Aff. ¶¶ 10-28; Exs. E-Y.  Blake hired or promoted all of the replacement employees in cases of vacancies within her departments, and she had independent discretion to hire, fire, and promote without needing to obtain approval from Glamann, Rostad, Miller, or Cruver.  Rostad Aff. ¶ 8; Glamann Aff. ¶ 27; Exs. X, Y.

During her approximately one year tenure at Classic, Blake fired a total of 16 employees in her departments: Alesha D.; Bret B.; Dawn H.; Donna T.; Heather V.; Jessica R.; Ryan C.; Laurie C.; Mary F.; Mischelle J.; Patricia M.; Roary H.; Teresa N.; Trisha P.; Vanessa H.; Yamil M.  Benford Aff. ¶ 18.  Thus, over the tenure of her employment, Blake fired an average of more than one employee per month.  *Id.*

During that same tenure, Blake hired a total of 29 employees for Classic to work in her departments: Trisha P.; Cynthia L.; Anne M.; Mary F.; Alesha D.; Mitchell F.; Katrina M.; Laurie C.; Shelby P.; Miranda S.; Donna T.; Roary H.; Marylou Z.; Kodi A.; Jane K.; Matthew M.; Elizabeth M.; Amber H.; Danielle (Vanessa) H.; Laverne L.; Dakota M.; Kirai B.; Tanya E.; Cheryl W.; Aeria Y.; Dawn H.; Bridgette R.; Marian H.; Shania C.  *Id.*  Thus, over the tenure of her employment Blake hired an average of more than two employees per month.  *Id.*  During that same tenure, Blake promoted a total of five employees in her departments: Anastasia M.; Elizabeth M.; Heather C.; Renate Y.; and Samantha R.  *Id.*

Blake made all of these hiring and firing decisions on her own, perhaps sometimes asking for advice or opinions, but never requiring approval from anyone over her.  There was never an instance where Glamann, Rostad, or any other Classic owner overrode or countermanded Blake's decisions

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska  99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment                    December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG                    Page 6 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 9 of 57

regarding hiring and firing or promotion. Rostad ¶ 4. There was one occasion, with respect to an employee named Jessica R., where Blake terminated the employee despite Rostad's contrary recommendation. Rostad Dep. 119:12-120:18.

While Blake was employed by Classic as the manager of the Fairbanks Market, which consisted of the two Fairbanks retail stores, and the Outside Retail Sales departments, Blake regularly supervised more than fifteen full-time employees. Benford Aff. ¶ 6. At the least, during one period of time, from February 2014 to March 2014, Blake supervised fifteen full-time employees: John C.; Alesha D.; Anastasia M.; Chelsey T.; Cynthia L.; Heather C.; Janice J.; J.R. M.; Katrina M.; Laura C.; Mitchell F.; Renate Y.; Samantha R.; Sunnie C.; and Troy P. *Id.* At the most, at one point in time from October 2013 to November 2013, Blake supervised a total of twenty-two full-time employees: Ashlee F.; Anastasia M.; Anne M.; Austin B.; Bret B.; Chelsey T.; Cynthia L.; Heather C.; Heather V.; Janice J.; Jessica R.; John C.; Josephine W.; JR M.; Laura C.; Renate Y.; Ryan C.; Samantha R.; Sunnie C.; Teresa N.; Trisha P.; and Troy P. *Id.* In addition to supervising sales associates in the Fairbanks stores, Blake also supervised floor supervisor employees in those stores. Rostad Aff. ¶ 8. At various times during her tenure, the following supervisory employees worked under Blake's direct authority and supervision: Heather C. (closer Airport Road store); Samantha R. (Outside Retail Sales Supervisor); Anastasia M. (a Lead Supervisor); Renate Y. (Floor Supervisor, Downtown Fairbanks store); Katina M. (Floor Supervisor, Downtown Fairbanks store); Elizabeth M. (Floor Supervisor, Downtown Fairbanks store); Ryan C. (Floor Supervisor, Downtown Fairbanks store); and Jessica R. (Floor Supervisor, Downtown Fairbanks store). *Id.*

In addition to hiring and firing, Blake also had responsibility and independent authority to discipline employees and to handle other personnel matters. Rostad Aff. ¶ 9; Glamann Aff. ¶ 10, 13, 15, 26-36; Exs. E, I, K, W, X, Z, AA-AG. As manager, Blake (a) directed employee work; (b) set

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment          December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG          Page 7 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 10 of 57

employee work schedules; (c) authorized employee leave and vacation time; (d) conducted employee performance evaluations; (e) interviewed, hired, trained, disciplined, promoted, and discharged employees; (f) set and adjusted employee rates of pay; (g) handled employee complaints and grievances; (h) handled customer complaints and grievances; (i) conducted quality control; (j) advertised and marketed to potential customers; (k) monitored and trained subordinate employees to ensure a safe and healthy workplace; (l) managed personnel; and (m) adjusted employee benefits (pay raises). Rostad Aff. ¶¶ 2-14, 19, 24; Glamann Aff. ¶ 29; Exs. A, B, D, M, N, Z, AB, AD, AE, AJ, BP-BS. Blake's own words, contained in an email sent to Glamann on July 31, 2014, clearly displays the breadth and scope of Blake's executive and administrative responsibilities within Classic. Glamann Aff. ¶10. Ex. E; Blake Dep. 54:21-55:2 (Blake's testimony wherein she admits that Ex. E is an email that she wrote and sent to Glamann).

As manager of her departments, Blake participated in developing the budgets for her departments. Rostad Aff. ¶ 13; Glamann Aff. ¶¶ 39-40; Ex. AJ. The budgeting process at Classic occurs once per year at the end of the year for the next year. Glamann Aff. ¶¶ 39-40. Blake completed a proposed budget form for 2014 and filled in the amounts of money that she wished for her departments. *Id.* Benford forwarded the budget template to Blake and other managers with information filled in for existing wages. *Id.* Blake filled in the template and then forwarded it to Glamann. *Id.* Blake attended Classic's annual "summit" at which the budget was discussed between ownership, Glamann, and department managers. Rostad Aff. ¶ 19. Blake's total budgets for her two departments exceeded $865,000. Rostad Aff. ¶ 13.

## III.  BLAKE'S COMPENSATION

Blake was employed by Classic from late 2013 to late 2014 on a salary basis, with an annual salary of $62,000. Benford Aff. ¶ 3. In addition to her salary, Blake received the following benefits:

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

160 hours of paid vacation included in salary; 16 hours of paid holiday included in salary; $22 life insurance; and $1,466.98 for medical insurance. *Id.* These benefits brought Blake's total annual compensation to $69,716.47. *Id.* As an exempt, salaried employee, Blake was told that Classic expected no more than an average of forty hours per week of work from her but that from time to time the circumstances of her job might require more. Rostad Aff. ¶ 18. As an exempt, salaried employee, Blake was instructed that if circumstances arose that required her to work more than forty hours in a week, she should accommodate by taking time off. *Id.* Rostad personally had this conversation with Blake on numerous occasions. *Id.* Because Blake was an exempt, salaried employee—and was not an hourly employee—the number of hours that she worked did not affect the amount that she was paid by Classic. *Id.* Classic paid Blake an agreed-upon salary in her managerial position. *Id.* Blake's salary was not subject to deductions, other than standard payroll deductions. *Id.*

## IV.  SCALF'S JOB RESPONSIBILITIES

Scalf worked for Classic during the period of about 2008 through August 2, 2015. At times pertinent to this lawsuit, Scalf worked as Classic's Corporate Outfitting and Embroidery Director or Manager. Rostad Aff. ¶ 15. Scalf was a salaried, exempt employee who was not entitled to overtime compensation. *Id.* ¶ 16. Scalf's job involved both office and non-manual work directly related to the management or general business operations of Classic and managing a recognized department of Classic. *Id.* Scalf's duties involved the exercise of discretion and independent judgment with respect to matters of importance to Classic. *Id.* Scalf directed the work of at least two or more other full-time employees within her department, and she had the authority to hire and fire other employees, to take other personnel-related actions, and to have her suggestions and recommendations regarding such hiring and firing and other personnel-related matters given significant consideration. *Id.;* Benford Aff. ¶ 5.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment          December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG          Page 9 of 47

As Corporate Outfitting and Embroidery Director or Manager, Scalf was responsible for all aspects or Classic's retail sales processed through the orders and fulfillment system relating to the Corporate Outfitting/Embroidery department. Rostad Aff. ¶ 17. Scalf worked closely with Classic ownership, finance, merchandising, advertising and the market managers to execute overall company strategies. *Id.* Scalf had ultimate responsibility for ensuring that Corporate and Embroidery orders were handled consistently and efficiently and that customers were happy with their shopping experience through those channels. *Id.* Within her position, Scalf routinely supervised and directed as many as two and periodically three employees. Benford Aff. ¶ 5. A true and correct photocopy of the Job Description for Scalf's manager position with Classic is marked as Ex. C to Classic's Motion for Summary Judgment. Rostad Aff. ¶ 17. The job description reflected in **Ex. C** is complete and is in the form that it existed throughout Scalf's work tenure with Classic. Rostad Aff. ¶ 17.

Classic held an annual management planning "summit," which included the owners/executive management, Glamann, and each of the mid-level managers. Scalf attended and provided input at this summit in 2013 and 2014. Rostad Aff. ¶ 19. As manager, Scalf (a) directed employee work; (b) set employee work schedules; (c) authorized employee leave and vacation time; (d) conducted employee performance evaluations; (e) interviewed, hired, trained, disciplined, promoted, and discharged employees; (f) set and adjusted employee rates of pay; (g) handled employee complaints and grievances; (h) handled customer complaints and grievances; (i) negotiated corporate contracts; (j) conducted quality control; (k) advertised to corporate clients; (l) marketed to corporate clients; (m) monitored and trained subordinate employees to ensure a safe and healthy workplace; (n) managed personnel; and (o) adjusted employee benefits (pay raises). Rostad Aff. ¶¶ 15-19, 24-39; Exs. C, AL-AZ, BA-BC, BT. Scalf's own résumé, which she created and submitted to Rostad for purposes of obtaining a promotion, displays the breadth and scope of Scalf's executive and administrative

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 10 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 13 of 57

responsibilities within Classic. Ex. BT; Scalf Dep. 12:13-25; 13:14-23; 14:9-18 (Scalf's testimony wherein she admits Ex. BT is her résumé, she created the résumé, she filled it out truthfully, and she submitted it to Rostad as part of an application for a promotion within Classic); Rostad Aff. ¶ 38 (Scalf submitted this résumé to Rostad when she applied to be promoted to the Corporate Sales Director, the supervisor of the Corporate Sales Managers).

## V.    SCALF'S COMPENSATION

Scalf was employed by Classic on a salary basis that was adjusted on an annual basis during the year by either a cost-of-living allowance or a raise. *See* Benford Aff. ¶ 4. Scalf was paid an annual salary of $43,000 increased to $44,000 in 2012; $44,000 increased to $44,867 in 2013; $44,867 increased to $47,500 in 2014; and $47,500 increased to $50,000 in 2015. *Id.* In addition to her salary, Scalf received the following benefits: 449 hours of paid vacation included in salary; 32 hours of paid holiday included in salary; $511.48 as a holiday bonus; $231.00 for life insurance; $13,218.37 for medical insurance; $1,429.35 for health reimbursement; a $6,446.96 401(k) match; and $2,173.50 profit sharing. *Id.* These benefits brought Scalf's total annual compensation to an average of $52,910 over the course of 2012-2015. *Id.*

As an exempt, salaried employee, Scalf was told that Classic expected no more than an average of forty hours per week of work from her but that from time to time the circumstances of their jobs might require more. Rostad Aff. ¶ 18. As an exempt, salaried employee, Scalf was instructed that if circumstances arose that required her to work more than forty hours in a week, she should accommodate by taking time off. *Id.* Rostad personally had this conversation with Scalf. *Id.* Because Scalf was an exempt, salaried employee, and was not an hourly employee, the number of hours that she worked did not affect the amount that she was paid by Classic. *Id.* Classic paid Scalf an agreed-upon salary in her

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment          December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG          Page 11 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 14 of 57

managerial position. *Id.* Scalf's salary was not subject to deductions, other than standard payroll deductions. *Id.*

## LEGAL STANDARD

Fed. R. Civ. P. 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4]

The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"[5] "The moving party initially bears the burden of proving the absence of a genuine issue of material fact."[6] "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."[7] "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial."[8] "This burden is not a light one."[9]

---

[4] Fed. R. Civ. P. 56(a).

[5] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. Rule Civ. Proc. 56(e), 28 U.S.C. App. at 626).

[6] *In re Oracle Corp. Securities Lit.,* 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[7] *Oracle*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325).

[8] *Id.*

[9] *Id.*

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 12 of 47

"The non-moving party must show more than the mere existence of a scintilla of evidence."[10] "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue."[11] "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."[12] "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor."[13]

"In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all *justifiable* inferences are to be drawn in its favor."[14] Moreover, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case."[15] Ultimately, the court's summary judgment inquiry as to whether a genuine issue exists is "whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant."[16]

---

[10] *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

[11] *Id.* (citing, *Matsushita*, 475 U.S. at 586).

[12] *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996), and *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979)).

[13] *Oracle*, 627 F.3d at 387 (citing *Anderson*, 477 U.S. at 252).

[14] *Id.* (emphasis added).

[15] *Anderson*, 477 U.S. at 255.

[16] *Id.*

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 13 of 47

## ARGUMENT

### VI. BLAKE AND SCALF WERE EXEMPT EMPLOYEES WHO WERE NOT ENTITLED TO OVERTIME PAY UNDER EITHER THE FLSA OR THE AWHA

Under the AWHA and FLSA, employers are required to pay overtime wages for "non-exempt" employees who work in excess of 40 hours a week.[17] Both Acts, however, exempt persons who are employed in a "bona fide executive, administrative, or professional capacity."[18] Exemptions under the FLSA and AWHA are narrowly construed against the employer.[19] Thus, it is the employer's burden to show entitlement to an exemption from the FLSA and AWHA.[20]

Under the FLSA, the employer must prove the exemption "by a preponderance of the evidence."[21] The standard to be applied under the AWHA is not clear. In *Dayhoff v. Temsco Helicopters, Inc.*, the Alaska Supreme Court held that the AWHA requires employers to prove an exemption "beyond a reasonable doubt."[22] However, the *Dayhoff* court simply adopted what was believed to be the federal standard under the FLSA at the time.[23] In *Resurrection Bay*, the Alaska Supreme Court recently recognized that federal circuit courts, including the Ninth Circuit, have almost unanimously adopted a preponderance of the evidence standard for proving FLSA exemptions.[24]

---

[17] *See* 29 U.S.C. § 207; AS 23.10.060.

[18] *See* 29 U.S.C. § 213(a)(1); AS 23.10.055(a)(9)(A).

[19] *See Resurrection Bay Auto Parts, Inc. v. Alder*, 338 P.3d 305, 308 (Alaska 2014); *see also Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1112 (9th Cir. 2001).

[20] *See Resurrection Bay*, 338 P.3d at 308; *see also Baldwin*, 266 F.3d at 1112.

[21] *See Resurrection Bay*, at 308 n.14.

[22] *Dayhoff*, 848 P.2d 1367, 1371-72 (Alaska 1993); *see Fred Meyer of Alaska, Inc. v. Bailey*, 100 P.3d 881, 884 (Alaska 2004) (citing *Dayhoff*, 848 P.2d at 1371-72).

[23] *See Dayhoff*, 848 P.2d at 1372 (quoting *Adams v. United States*, 26 Cl. Ct. 782, 786 (1992).

[24] *See Resurrection Bay*, 338 P.3d at 308 n.14 (citing *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581 (5th Cir. 2013); *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 646 (6th Cir. 2013);

BRENA, BELL & CLARKSON, P.C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG
December 1, 2017
Page 14 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 17 of 57

Further, without directly deciding the issue, the court in *Resurrection Bay* appeared to question the continued viability of the beyond-a-reasonable-doubt standard for AWHA exemptions.[25] Thus, it is unclear whether the AWHA presently requires proof of an exemption by a preponderance of the evidence or beyond a reasonable doubt.[26] Whether an employee's duties exclude them from the overtime benefits of the FLSA is a question of law appropriate for determination on summary judgment.[27]

### A. Blake and Scalf Were Both Exempt Executive Employees and Not Entitled to Overtime Pay.

#### 1. Legal Standard for Exempt Executive Employees.

Under the AWHA and FLSA, for the time period relevant to this dispute, an employee qualifies for the "bona fide executive" exemption if:

(1) they are "[c]ompensated on a salary basis at a rate of not less than $455 per week:"

(2) their "primary duty is management of the enterprise in which [they are] employed or of a customarily recognized department or subdivision thereof;"

(3) they "customarily and regularly direct the work of two or more other employees;" and

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

---

*Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1158 (10th Cir. 2012); *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 507 (7th Cir. 2007); *Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1566 n.5 (11th Cir. 1991); *Dickenson v. United States*, 353 F.2d 389, 392 (9th Cir. 1965)).

[25] *See Resurrection Bay*, 338 P.3d at 308 n.14.

[26] To the extent the Court believes this is an outcome-determinative issue, the Court has the option of certifying the matter to the Alaska Supreme Court for guidance. *See* Alaska R. App. P. 407.

[27] *See Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120 (9th Cir. 2002) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)); *see also Bailey v. Alpha Tech. Inc.*, Case No. C16-0727-JCC, 2017 WL 4167929 at *5 (W.D. Wash. September 19, 2017); *Quintiliani v. Concentric Healthcare Solutions, LLC*, 944 F. Supp. 2d 738, 743 (D. Ariz. 2013).

Classic Alaska's Memorandum in Support of Motion or ummary Judgment      December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG      Page 15 of 47

(4) they have "authority to hire or fire other employees" or their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."[28]

Notably, factor 1 is not in dispute. Blake and Scalf were undeniably compensated on a salary basis at a rate of not less than $455 per week. Indeed, throughout the course of their employment with Classic Alaska, Blake earned $1,192 per week plus benefits[29] and Scalf earned between $827-962 per week plus benefits.[30] Rather, the focus of the parties' dispute, and correspondingly the arguments and discussion advanced herein, is whether Blake and Scalf satisfied factors 2–4 of the executive exemption test.

---

[28] 29 C.F.R. § 541.100(a) (2016); *see* AS 23.10.055(c)(1); *Moody v. Royal Wolf Lodge*, 339 P.3d 636, 639 n.15 (Alaska 2014) (explaining that in 2005 the Alaska Legislature amended the AWHA to adopt the federal definitions of "administrative," "executive," and "professional" employees); *Resurrection Bay*, 338 P.3d at 308 ("Alaska's law specifically directs that for purposes of its exemptions, the term 'bona fide executive' employee 'has the meaning and shall be interpreted in accordance with 29 U.S.C. 201-219 [FLSA] as amended, or the regulations adopted under those sections.") (bracketed text in original)). These factors are derived from the Department of Labor's ("DOL") regulations interpreting the executive exemption, as amended in 2004. DOL's 2016 amendments to its regulations, which would have increased the minimum salary level for exempt employees significantly, were set to go into effect on December 1, 2016. However, on August 31, 2017, the United States District Court for the Eastern District of Texas issued a nationwide injunction prohibiting implementation and enforcement of those amended regulations. *See Nevada v. United States*, Case No. 4:16-CV-731, 2017 WL 3837230 (E.D. Texas August 31, 2017). Regardless, because Scalf's and Blake's claims arose between 2013 and 2015, the 2004 version of the DOL's regulations govern Scalf's and Blake's claims.

[29] Benford Aff. ¶ 3; *see also* Ex. D. $62,000/52 weeks = $1,192 per week.

[30] Benford Aff. ¶ 4. $43,000/52 weeks = $827 per week in 2012. $50,000/52 weeks = $962 per week in 2015; *see also* Scalf Dep. 60:17-22 ("Q. How many years were you salary? A. Since 2008. Q. 2008 to what? A. 2015.").

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment                    December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG              Page 16 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 19 of 57

### a. Management Responsibilities.

The executive exemption only applies if the employee's primary duty is "management."[31]

DOL's regulations provide further guidance as to which work responsibilities qualify as management.

DOL's listed management duties include, but are not limited to:

> (1) interviewing, selecting, and training of employees; (2) setting and adjusting their rates of pay and hours of work; (3) directing the work of employees; (4) maintaining production or sales records for use in supervision or control; (5) appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; (6) handling employee complaints and grievances; (7) disciplining employees; (8) planning the work; (9) determining the techniques to be used; (10) apportioning the work among the employees; (11) determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; (12) controlling the flow and distribution of materials or merchandise and supplies; (13) providing for the safety and security of the employees or the property; (14) planning and controlling the budget; and (15) monitoring or implementing legal compliance measures.[32]

To qualify for exemption, the employee's "primary duty" must be the performance of the types of managerial responsibilities listed above.[33]

### b. Primary Duty.

"An employee's primary duty is what the employee does 'that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time.'"[34] Indeed, DOL has defined the term "primary duty" to mean "the principal, main, major or

---

[31] 29 C.F.R. § 541.100(a) (2016).

[32] 29 C.F.R. § 541.102 (2016) (numeric parentheticals added).

[33] 29 C.F.R. § 541.700(a) (2016) ("To qualify for exemption under this part, an employee's 'primary duty' must be the performance of exempt work.").

[34] *Gellhaus v. Wal-Mart Stores, Inc.,* 769 F. Supp. 2d 1071, 1078 (E. D. Tex. 2011) (citation omitted); *see also Baldwin,* 266 F.3d at 1115 ("The Baldwin's principal value to Trailer Inns was directing the day-to-day operations of the park even though they performed a substantial amount of manual labor."); *Dalheim v. KDFW-TV,* 918 F.2d 1220, 1227 (5th Cir. 1990) ("At least under the short tests, the employee's primary duty will usually be what she does that is of principal value to the employer, no

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone (907) 258-2000
Facsimile (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment                December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG                Page 17 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 20 of 57

most important duty that the employee performs."[35] "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."[36]  Factors to consider when determining an employee's primary duty include, but are not limited to:  (1) the amount of time spent performing exempt work; (2) the relative importance of the exempt duties as compared with other types of duties; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.[37]

### c.  Time Spent on Exempt Duties.

DOL's regulations provide that "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee."[38]  DOL's regulations explain further that:

> [E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement.  Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.  Employees who do not spend more

---

the collateral tasks that she may also perform, even if they consume more than half her time."); *Byers v. Petro Servs., Inc.*, 110 F. Supp. 3d 1277, 1283 (S. D. Fla. 2015) ("However, the amount of time an employee spends on a given task is not determinative of his primary duty, rather, the question is which duties constituted the primary value the employer placed on the employee."); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 866 (N. D. Tex. 2001) ("Under the 'short test,' the employee's primary duty will usually be what he does that is of principal value to the employer, not the collateral tasks that he may perform, even if they consume more than half his time.").

[35] 29 C.F.R. § 541.700(a) (2016).

[36] 29 C.F.R. § 541.700(a) (2016).

[37] 29 C.F.R. § 541.700(a) (2016) (numerical parentheticals added); *see also Baldwin*, 266 F.3d at 1113; *Smith v. Brennan*, 115 F. Supp. 3d 691, 699 (E. D. Va. 2015); *Byers*, 110 F. Supp. 3d at 1281-82; *Gellhaus*, 769 F. Supp. 2d at 1078; *DePew v. ShopKo Stores, Inc.*, Case No. CV-03-0539-S-BLW, 2006 WL 1663272 at *7 (D. Idaho May 30, 2006);

[38] 29 C.F.R. § 541.700(a) (2016).

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone:  (907) 258-2000
Facsimile:  (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment                December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG                Page 18 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 21 of 57

than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant mangers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.[39]

"Time is not the sole test, however, and employees who spend less than fifty percent of their time performing exempt work may still meet the primary-duty requirement if other factors support such a conclusion."[40]

Further, "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met." Indeed, as DOL's regulations explain:

Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. . . . For example, an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management. An assistant manager can supervise employees and serve customers at

---

[39] 29 C.F.R. § 541.700 (2016).

[40] *Gellhaus*, 769 F. Supp. 2d at 1078; *see also* 29 C.F.R. § 541.700; *Baldwin*, 266 F.3d at 1114 ("In interpreting the primary duty requirement, although the percentage of time spent on nonexempt tasks is relevant, it is not alone dispositive."); *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) ("Indeed, the regulations recognize that the 50 percent rule is not conclusive."); *Donovan*, 675 F.2d at 521 (2nd Cir. 1982); *DePew*, 2006 WL 1663272 at *7; *Smith*, 115 F. Supp. 3d at 700; *Byers*, 110 F. Supp. 3d at 1282-83; *Kreiner v. Dolgencorp, Inc.*, 841 F. Supp. 2d 897, 904-05 (D. Md. 2012); *Haines v. S. Retailers, Inc.*, 939 F. Supp. 441, 449 (E. D. Va. 1996).

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 19 of 47

the same time without losing the exemption. An exempt employee can simultaneously direct the work of other employees and stock shelves.[41]

In light of this, courts across the country have routinely held that employees can spend significantly more than 50 percent of their time performing nonexempt duties and still be considered exempt.

For example, in *Baldwin*, the Ninth Circuit found that management was the plaintiffs' primary duty despite the plaintiffs' claim that they spent 90 percent of their time on nonexempt work.[42] In *Spinden v. GS Roofing Products Co., Inc.*, the Eighth Circuit found that administration was the plaintiff's primary duty, despite the district court's finding that the plaintiff spent 80-90 percent of his time on nonexempt tasks.[43] In *Murray v. Stuckey's, Inc.*, the Eight Circuit found that management was the plaintiffs' primary duty, despite the district court's finding that they spent 65-90 percent of their time on non-managerial duties.[44] In *Jones v. Tiller*, the Tenth Circuit found that an employee who spent 90 percent of her time on nonexempt tasks qualified for administrative exemption.[45] In the case of *In re Family Dollar FLSA Litigation*, the Fourth Circuit found that an employee who spent 99 percent of her time on nonexempt tasks qualified for executive exemption.[46] In *Jones v. Virginia Oil Co.*, the Fourth Circuit found that an employee who spent 75-80 percent of her time on nonexempt tasks qualified for executive exemption.[47] In *Donovan*, the First and Second Circuits found that employees who spent over 50 percent of their time on nonexempt tasks qualified for executive

---

[41] 29 C.F.R. § 541.106(a) and (b) (2016).

[42] *Baldwin*, 266 F.3d at 1114-15.

[43] *Spinden*, 94 F.3d 421, 427 (8th Cir. 1996).

[44] *Murray*, 939 F.2d 614, 618 (8th Cir. 1991).

[45] *Jones*, 72 F.2d 138, 1995 WL 712674 at *3 (10th Cir. 1995).

[46] *In re Family Dollar FLSA Litigation*, 637 F.3d 508, 515 (4th Cir. 2011).

[47] *Virginia Oil*, 69 Fed.Appx. 633, 637-38 (4th Cir. 2003).

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment                    December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG                    Page 20 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 23 of 57

exemption.[48]  Finally, in *Branstetter v. General Parts Distribution, LLC*, the District Court for the District of Oregon found that an employee who spent 90 percent of his time on nonexempt tasks qualified for executive exemption.[49]

In short, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."[50]  Conversely, "there is no per se rule that once the amount of time spent on manual labor approaches a certain percentage, satisfaction of this factor is precluded as a matter of law."[51]  Indeed, the fact "[t]hat an employee is performing menial tasks alongside non-management employees does not mean that the employee was not simultaneously fulfilling a managerial role."[52]  In those instances, the court must examine the "character of the

---

[48] *Donovan,* 675 F.2d at 521-22; 672 F.2d at 226-27.

[49] *Branstetter*, No. 3:12-CV-02328-KI, 2013 WL 6780672 at *10-11 (D. Or. Dec. 19, 2013) (citing *Family Dollar FLSA Litigation*, 637 F.3d 508); *see also Smith*, 115 F. Supp. 3d at 700 (employee can qualify for exemption despite spending 80 percent of his time on nonexempt tasks); *Cort v. Kum & Go, L.C.*, 923 F. Supp. 2d 1173, 1179-80 (W. D. Mo. 2013) (employee can qualify for exemption despite spending 80 percent of his time on nonexempt tasks); *Kreiner*, 841 F. Supp. 2d at 904-05 (employee was exempt despite spending 75-80 percent of his time on nonexempt tasks); *Pollard v. GPM Invs., LLC*, No. 3:10-cv-115, 2011 WL 864329 at *7 (E. D. Va. Mar. 10, 2011) (employee can qualify for exemption despite spending 80 percent of his time on nonexempt tasks); *Kastor*, 131 F. Supp. 2d at 866-67 (employee was exempt despite claiming that he spent 90 percent of his time on nonexempt tasks); *Royster v. Food Lion*, No. 97-1443, No. 97-1444, No. 94-2645, No. 95-1274, 1998 WL 322682 at *9 (4th Cir. June 4, 1998) (employees were exempt despite claiming that they spent 95 percent of their time on nonexempt tasks).

[50] 29 C.F.R. § 541.700(a) (2016).

[51] *In re Family Dollar*, 637 F.3d at 515 (citing *Thomas Speedway SuperAmerica, LLC*, 506 F.3d 496, 504 (6th Cir. 2007) ("[T]he time factor . . . might even be somewhat misleading where the employee's management and nonmanagement functions are [not] . . . clearly severable."); *see also Baldwin*, 266 F.3d at 1114-15; *Spinden*, 94 F.3d at 427; *Murray*, 939 F.2d at 618; *Jones*, 72 F.2d 138, 1995 WL 712674 at *3 (10th Cir. 1995); *Virginia Oil*, 69 Fed. Appx. at 637-38; *Donovan*, 675 F.2d at 226-27, 521-22; *Smith*, 115 F. Supp. 3d at 700; *Pollard*, 2011 WL 864329 at *7; *Byers*, 110 F. Supp. 3d at 1283.

[52] *Byers*, 110 F. Supp. 3d at 1283; *see also Donovan*, 672 F.2d at 226 ("[O]ne can still be 'managing' if one is in charge, even while physically doing something else.").

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile  (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment          December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG          Page 21 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 24 of 57

employee's job as a whole"[53] in order to determine whether the employee's primary duty, or "principal value" to the employer, was the performance of exempt work.[54]

### d. Relative Importance of Exempt Duties.

This factor requires a comparison between the "importance of plaintiff's managerial duties [and] nonmanagerial duties, keeping in mind the end goal of achieving the overall success of the company."[55] Indeed, "[c]ourts determine how important exempt duties are by measuring 'the significance of the managerial tasks to the success of the facility.'"[56] The fact that the employee "performed some of the same tasks as [the employee's] subordinates is not in and of itself evidence that the [employee does] not qualify for the exemption."[57] "Likewise, the fact that [the employees] may have performed some managerial tasks does not demonstrate that [the employee] is a nonexempt employee."[58] Rather, the purpose of this analysis is to determine the employee's "principal value" to the company.[59]

### e. Relative Freedom from Direct Supervision.

This factor requires consideration of whether the employee had sufficient discretion "to engage in significant management duties without . . . interference or supervision."[60] "Importantly, the test is

---

[53] 29 C.F.R. § 541.700(a) (2016).

[54] *Baldwin*, 266 F.3d at 1115.

[55] *Speedway*, 506 F.3d at 505; *see Baldwin*, 266 F.3d at 1114-15.

[56] *Smith*, 115 F. Supp. 3d at 699.

[57] *Baldwin*, 266 F.3d at 1115.

[58] *Frey v. Spokane Cty. Fire Dist. No. 8*, No. CV-05-289-RHW, 2006 WL 2597956 at *6 (E. D. Wash. Sept. 11, 2006) (citing *Baldwin*, 266 F.3d at 1115).

[59] *Baldwin*, 266 F.3d at 1115.

[60] *See Smith*, 115 F. Supp. 3d at 700; *see also Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1270 n.57 (11th Cir. 2008) ("Having discretionary power is one aspect of freedom from supervision.").

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment          December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG                    Page 22 of 47

not whether there were other people above [the employee] on the totem pole, but rather whether he had sufficient freedom from direct supervision."[61] "A managerial employee may come within the FLSA's executive exemption even where her discretion is circumscribed by corporate policies, or the employee reports to a supervisor."[62] The employee "need not have ultimate authority for all managerial decisions in order to be exempt under FLSA."[63] Indeed, "[i]f exemption required complete authority and no supervision, only the CEO of a company (if anyone) would be exempt."[64] Accordingly, the Court's

---

[61] *Smith*, 115 F. Supp. 3d at 700.

[62] *Byers,* 110 F. Supp. 3d at 1284; *see also Baldwin*, 266 F.3d at 1115 (employees were relatively free from supervision, despite the fact that the employees "had to adhere to company policies, record completed tasks on checklists, and were subject to performance reviews conducted through a monthly inspection"); *Branstetter*, 2013 WL 6780672 at *2, 11 (employee was free from supervision despite the fact that the employee's supervisor would meet with the employee "every morning" in order to tell the employee "what needed to get done that day"); *Murray*, 939 F.2d at 619 (employee was relatively free from supervision, despite having an "active regional manager boss" who was present at the store from "time to time" and communicated "by phone with the [employee] at least weekly to monitor compliance with [the store's] standardized methods of operation"); *Donovan*, 672 F.2d at 223 (concluding that employees whose tasks were "governed by highly detailed, step-by-step instructions contained in" the company manual that "admit of little or no variation" had management as their primary duty); *Smith*, 115 F. Supp. 3d at 700 (employee was free from supervision despite having an "on-site manager" present at the workplace); *Byers*, 110 F. Supp. 3d at 1284 (employee was free from supervision, despite being "required to adhere to certain corporate policies and report[] to regional supervisors"); *Pollard*, 2011 WL 864329 at *8 (employee was free from supervision even though he "was not authorized to issue refunds to customers," and had to seek approval of the store manager before disciplining employees or rearranging employee schedules); *Thomas*, 64 F. Supp. 2d at 1213-14 (employee was free from supervision despite having a supervisor who "called ten to 15 times a day," was "very hands-on," "had veto power over some of [the employee's] decisions," and, "initially, visited the restaurant everyday").

[63] *Kreiner*, 841 F. Supp. 2d at 907.

[64] *Kreiner*, 841 F. Supp. 2d at 907 (parenthetical text added) (citing *Speedway*, 506 F.3d at 507 ("[W]e reiterate that the third factor considers only the '*relative* freedom from supervision'; it does not demand complete freedom from supervision, such that she is answerable to no one, as this would disqualify all but the chief executive officer."); *see also Kastor*, 131 F. Supp. 2d at 867-68 ("If final decision making authority were the test for determining whether a person was an executive or administrative employee, one would rarely, if ever, qualify as such an employee under the regulations. A president or chief executive officer of a company could say that he does not have final decision making authority because

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion or ummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 23 of 47

analysis must only consider whether the employee was *relatively* free from daily supervision—complete freedom is not required.

### f. Relationship Between Salary and Wages Paid Other Employees.

This factor requires the Court to consider the pay differential between the allegedly exempt employee's salary and the hourly wages paid to other non-exempt employees. Notably, "[n]o specific mathematical formula is prescribed for determining whether an allegedly exempt employee's salary is higher than a non[exempt employee's] wage."[65] In *Baldwin*, rather than converting salaried pay to hourly pay and then comparing calculated hourly rates, the Ninth Circuit simply compared the plaintiffs' monthly salary earned as managers to their assistant managers' monthly salary.[66] The court did this despite knowing the number of hours that each plaintiff and each assistant manager worked, and knowing that plaintiffs worked more hours than their assistant managers.[67] Additionally, the Fourth Circuit has stated that the "mathematical gymnastics" of hourly wage calculation are not required; instead, the court "simply compare[s] the manager's weekly salary with the highest possible non-exempt weekly wage" to determine the pay differential.[68] In the end, if the "allegedly exempt employee makes more money than non-exempt employees, this factor favors exemption."[69]

---

he is only authorized to carry out the policies set by the board of directors, and the board of directors is free to review and veto his decisions.").

[65] *Cort*, 923 F. Supp. 2d at 1183; *see also* 29 C.F.R. § 541.700 (2016).

[66] *Baldwin*, 266 F.3d at 1115.

[67] *Baldwin*, 266 F.3d at 1110.

[68] *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1278-79 (S. D. Fla. 2004); *see also Cort*, 923 F. Supp. 2d at 1183.

[69] *Kreiner*, 841 F. Supp. 2d at 907-08.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 24 of 47

### g. Supervision of Two or More Employees.

To qualify for the executive exemption, the employee must "customarily and regularly" direct the work of two or more other full-time employees or their equivalent.[70] The phrase "customarily and regular" means "a frequency that must be greater than occasional but which, of course, may be less than constant."[71] While "[c]ourts have declined to set bright-line rules regarding what constitutes 'customarily and regularly[,]' . . . courts have typically construed the regulation to require an individual to supervise two or more full-time employees at least seventy-five to eighty percent of the time."[72]

---

[70] *See* 29 C.F.R. § 541.100(a)(3), 104 (2016).

[71] 29 C.F.R. § 541.701 (2016); *see also Baldwin*, 266 F.3d at 1117; *Resurrection Bay*, 338 P.3d at 309.

[72] *Awan v. Durrani*, No. 14-cv-4562 (SIL), 2015 WL 4000139 at *6 (E.D.N.Y. July 1, 2015) (citing *McKinney v. United Stor-All Ctrs. LLC*, 656 F. Supp. 2d 114, 131-32 (D. D.C. 2009)); *see Morgan*, 551 F.3d at 1276 (holding that the trial court did not err in requiring an 80 percent threshold for the "customarily and regularly" requirement); *Sec'y of Labor v. Daylight Dairy Prods., Inc.*, 779 F.2d 784, 788 (1st Cir. 1985) ("[T]he district court determined that no manager in the category at issue met the 80-hour requirement more than 76 percent of the time. We agree with the district court's conclusion that this falls short of 'regular and customary' supervision of 80 hours of work."); *Jackson v. Go-Tane Servs., Inc.*, 56 Fed. Appx 267, 272 n.8 (7th Cir. 2003) (stating that "where the supervised employees work 'full time' only 67% of the time over the relevant time period, such amount of supervision falls short of the 'regular and customary' supervision" requirement); *Perez v. Radioshack Corp.*, 552 F. Supp. 2d 731, 741-42 (N. D. Ill. 2005) (holding that an eighty percent standard "comports with the regulatory direction that 'customary and regular' signifies a frequency greater than occasional but less than constant"); *Murray*, 50 F.3d at 568 (disagreeing with *Daylight Dairy* that 76 percent falls short of "regular and customary" but finding that supervising "at least two or more employees who worked eighty hours per week 98.2% of the time . . . is 'customarily and regularly' by any definition"); *Resurrection Bay*, 338 P.3d at 310 n.23 (finding that it was "unnecessary . . . [to] establish bright-line rules about the number of hours necessary to qualify other employees as 'full time,'" but holding that supervising 80 hours of other employees' time for "a few months" throughout the course of a two-year employment period did "not meet the requirement that supervision be 'customary and regular'").

BRENA, BELL & CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment    December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG    Page 25 of 47

Case 4:16-cv-00005-SLG    Document 92    Filed 12/01/17    Page 28 of 57

Notably, as the courts in *Murray* and *Resurrection Bay*, DOL's own guidelines provide that a 40-hour work week "is not a rigid standard" for defining full-time employment.[73]

### h. Authority to Hire, Fire, and Promote Employees.

To establish the applicability of the executive exemption, the employer must demonstrate that the employee had "authority to hire or fire other employees" or that the employee's "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [were] given particular weight."[74] Factors that the court may consider in making this determination include, but are not limited to, the following:

> [W]hether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker.[75]

Notably, "[a]n employee's suggestions or recommendations may still have 'particular weight' even if a higher manager's recommendation has more importance and even if the employee does not make the ultimate determination."[76] "Indeed, there is often a hierarchy in any organization wherein supervisors have persons to whom they must report, and the fact that an individual does not have final supervisory authority does not take that person out of the realm of being a manager in the organization."[77]

---

[73] *Murray*, 50 F.3d at 568; *Resurrection Bay*, 338 P.3d at 310 n.23.

[74] 29 C.F.R. § 541.100(a)(4) (2016).

[75] 29 C.F.R. § 541.105 (2016).

[76] 29 C.F.R. § 541.105 (2016); *see Gellhaus*, 769 F. Supp. 2d at 1081.

[77] *Gellhaus*, 769 F. Supp. 2d at 1081.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment                    December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG                    Page 26 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 29 of 57

## 2. Blake Was an Exempt Executive Employee.

The facts of this case demonstrate that Blake was an exempt executive employee. As described in detail above, Blake had numerous managerial responsibilities as Classic's Outside Retail Sales Manager and Fairbanks Market Manager.[78] Indeed, Blake, in an email to Glamann, specifically described at least thirteen managerial functions she performed within the course and scope of her employment as a manager for Classic: (1) hiring; (2) interviewing; (3) conducting background checks; (4) firing; (5) setting and communicating expectations for employee work performance; (6) reviewing employee work quality; (7) adjusting pay rates; (8) directing and assigning employee work; (9) setting employee schedules; (10) disciplining employees; (11) directing her own work; (12) providing for a safe and secure workplace; and (13) advertising through catalogue and website development.[79] Moreover, among other things, Blake was in charge of determining how merchandise would be

---

[78] *See supra* pp. 4-9.

[79] *See* Ex. E; *see also* Blake Dep. 27:15-17 ("Q. [A]s the job was described to you, did you understand you would be supervising employees? A. That was one of the job descriptions."); 27:25-28 ("[W]as one of the things that Monty described to you was that you would be hiring and firing folks? A. That, I believe was a job description."); 28:6-9 ("Q. Evaluating the performance of folks under you, whether they're doing the job they're supposed to be doing? A. I believe that might have been a job description."); 30:13-17 ("Q. So the job you were – as I understand what you've told me is, the job you were interviewing for was to be the head of the outside retail sales department. A. That was the job description."); 35:13-36:2 ("Q. So the employees that are interviewed by you, you make the decision to hire them? A. If I thought they were a good fit. . . . Q. So over the course of your years with Classic Alaska, how many employees would you say you hired? . . . A. I would guestimate approximately 10 in the 14 months."); Glamann Aff. ¶¶ 9-16; Exs. E-Z, AA-AG, BD (emails from Blake demonstrating managerial role and discretion); Yates Aff. ¶¶ 1-4; Merritt Aff. ¶¶ 1-4; Kalmbacher Aff. ¶¶1-4; Johnson Aff. ¶¶ 1-5.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion or Summary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 27 of 47

displayed in the store;[80] participating in and contributing in the determination of the annual budget;[81] and making recommendations regarding future merchandise to be offered at the store.[82] These responsibilities all qualify as managerial.

Examining Blake's "job as a whole,"[83] Blake's primary duty, or "principal value" to Classic, was the performance of her managerial responsibilities as Classic's Outside Retail Sales Manager and Fairbanks Market Manager.[84] Indeed, Blake's superiors felt she was fulfilling her primary role, which was to "lead[] her people through the day-to-day life of Big Ray's."[85] Blake was not micromanaged

---

[80] *See* Rostad Dep. 86:1-8 ("I can recall [Blake] – you know, in general, she would be working with . . . the buyers on where to put merchandise and display it, new merchandise coming in, and having her staff, you know, do that.").

[81] Benford Dep. 19:15-22:15; 73:10-74:8 (Benford's testimony describing the budgeting process through which managers, including Blake, would identify and input their "wish list" budget amounts for each of their respective departments into a pre-made template and then send that document back to Benford for review and consideration by the owners and entire management team); Glamann Aff. ¶¶ 39-40; Exs. AJ-AK.

[82] Rostad Dep. 56:3-16 ("Q. As outside sales manager, what . . . job duties did she perform? . . . A. [T]he outside retail sales manager would have input on new ideas or new products.").

[83] 29 C.F.R. § 541.700(a) (2016).

[84] Rostad Aff. ¶ 24.

[85] Rostad Dep. 87:4-11 ("I hope you'll remember my position is – is that is all delegated, and I trust the market manager to deal with that. And I'm walking through and walking around and – but I'm not, in my position, sitting there monitoring what these managers are doing all the times. So I saw her doing a myriad of tasks, and my general impression was that she was doing what needed to get done and leading her people through the day-to-day life of Big Rays."); Rostad Aff. ¶ 24.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment          December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG          Page 28 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 31 of 57

by her superiors.[86]  Blake was free to set her own schedule,[87] direct her own work,[88] and delegate any

and all tasks as she deemed appropriate.[89]  Blake was not instructed or required to perform any

non-exempt work.[90]  To the extent Blake did perform non-exempt work, it was the result of her own

decision to perform that work in order to ensure the successful operation of Classic.[91]  At times, Blake

may have concurrently performed duties that could be characterized as both exempt and non-exempt,

---

[86] *Id.*

[87] Rostad Dep. 107:1-4 ("She was a supervisor.  She was hired in an exempt position, and she was choosing to doing (*sic*) all of these hours, even when we counseled her that she didn't have to, that she could balance her time."); 107:15-19 ("[S]he is the supervisor, she sets her own hours, she chooses when to come and go and get the job done or take the day off when there's an opportunity."); Rostad Aff. ¶ 24.  Blake simply refused personally to accept the idea that she could take time off-even when Rostad told her to do so.  Blake Dep. Vol. 11, at 27-34.

[88] *Id.*

[89] Rostad Dep. 79:15-80:11 ("Q.  And so she did – part of that job was to open up the Airport store? A.  Well, part of her job – her responsibilities were to have people there to open that up, and supervisors to open that up and do that for her.  Now, if . . . just like anybody that's in a management position, if she had times when she – somebody didn't come in or anything like that, she would have to go open it up.  But it's . . . designed where she would have people and assign them to do that . . . she could choose that she wanted to go open up and work from there on a couple mornings.  That would be her choice.  But it's also part of . . . her overall scheme of where she's putting people and what she's having them do.  Q.  So it's – it's your understanding that if she chose – that if she opened up the Airport Road store herself, she – she chose to do so and she could have had a – a subordinate do it instead?  A.  That's right."); Rostad Aff. ¶ 24.

[90] *Id.*; *see also* Rostad Dep. 81:25-82:23 ("Q.  Did you have Suzanne mow the lawn at the Airport Road store?  A.  No.  Well, Suzanne chose to mow the lawn.  I've mowed the lawn.  Q.  Did you ask her to mow the lawn?  A.  We went out there – let me recall this.  One of the things that we want to do is keep our grounds neat.  So the market managers at all the – in Anchorage, Fairbanks, and Kodiak keep the building around it clean and neat.  You assign people to do – pick up trash, sweep the sidewalk, do those sort of things.  At Airport Road, we have a lawn, and you assign somebody to mow that lawn. You're not required to do it if you're the market manager, you assign somebody to do that. . . . If Suzanne [mowed] it, she never stopped being the . . . market manager. . . . [T]he system fully allows her to assign somebody to do that job, not do it herself.").

[91] *Id.*

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone:  (907) 258-2000
Facsimile:  (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment                    December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG                    Page 29 of 47

but Blake never stopped supervising other employees while performing those non-exempt tasks.[92] Indeed, "one can still be managing if one is in charge, even while physically doing something else."[93] Thus, although Blake may have performed some "collateral tasks," her primary duty, and "principal value" to Classic, remained the performance of her managerial responsibilities.

Moreover, as there was no one else performing the managerial functions assigned to Blake, the success of Classic depended upon her fulfilling her primary duty of managing her departments.[94] In that regard, the court's holding *In re Family Dollar FLSA Litigation* is particularly significant:

> In this case, Grace was in charge of a separate retail store, seeking to make it profitable. While she catalogs the nonmanagerial jobs that she had to do, claiming that they occupied most of her time, she does so without recognizing that during 100% of the time, even while doing those jobs, she was also the person responsible for running the store. Indeed, there was no one else to do so, and it cannot be rationally assumed, nor does the record support a claim, that the store went without management 99% of the time. Grace also fails to acknowledge the importance of performing nonmanagerial tasks in a manner that could make the store profitable, the goal of her managerial responsibility.[95]

Similarly, in this case, even while performing non-managerial jobs, Blake "was also the person responsible for running" her departments.

Blake always supervised more than two employees. In fact, at the least, during one period of time, from February 2014 to March 2014, Blake supervised fifteen full-time employees.[96] At the most, from October 2013 to November 2013, Blake supervised a total of twenty-two full-time employees.[97]

---

[92] *Id.*

[93] *Baldwin*, 266 F.3d at 1114 (quoting *Donovan*, 672 F.2d at 226).

[94] Rostad Aff. ¶ 24; Yates Aff. ¶ 2; Merritt Aff. ¶ 2; Kalmbacher Aff. ¶ 2; Johnson Aff ¶ 2.

[95] *In re Family Dollar FLSA Litgation*, 637 F.3d at 515.

[96] Benford Aff. ¶ 6.

[97] Benford Aff. ¶ 6.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001
.

Classic Alaska's Memorandum in Support of Motion orummary Judgment          December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG          Page 30 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 33 of 57

Blake always made significantly more than any of the non-exempt employees working under her. As stated above, Blake earned $62,000 per year plus benefits, which equates to approximately $2,400 every two weeks (salary alone). On an annual basis, the highest earning non-exempt employee under Blake earned on average approximately $36,985 (or $1,423 bi-weekly) in 2015.[98] Accordingly, Blake earned at least forty percent more than the non-exempt employees working under her.

Blake had authority to hire and fire employees. During the course of her employment, Blake hired 29 employees[99] and fired 16 employees.[100] Blake made all of these hiring and firing decisions on her own, perhaps sometimes asking for advice or opinions, but never requiring approval from anyone over her. There was never an instance where Glamann, Rostad, or any other Classic owner overrode or countermanded Blake's decisions regarding hiring, firing, or promotion.[101] In fact, on one occasion, Blake terminated an employee despite Rostad's recommendation to the contrary.[102] Blake also gave numerous pay raises to various employees within her departments.[103] While there is no dispute that Blake was not the Chief Executive Officer of Classic, Blake, as a manager, performed her primary managerial role with significant authority, discretion, and autonomy. Blake was unquestionably an exempt executive employee. And, importantly, courts tend to reject employees'

---

[98] Benford Aff. ¶ 3.

[99] *See supra* pp. 6-8.

[100] *See supra* pp. 6-8.

[101] Rostad Aff. ¶ 4.

[102] Rostad Dep. 119:12-120:18.

[103] *See* Ex. E; *see also* Glamann Aff. ¶ 33; Ex. AD (Blake wage increase forms); Rostad Aff. ¶ 11.

BRENA, BELL & CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion or ummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG
December 1, 2017
Page 31 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 34 of 57

"post-hoc efforts" to "down-play" and "minimize the relative importance of managerial duties" for the purpose of claiming they were non-exempt.[104]

### 3. Scalf Was an Exempt Executive Employee.

Scalf was also an exempt executive employee. As described in detail above, Scalf had numerous managerial responsibilities. Indeed, Scalf's own résumé, which she created and submitted to Rostad for purposes of obtaining a promotion, specifically describes at least fourteen managerial functions that she performed within the course and scope of her employment as a manager for Classic: (1) meeting and coordinating with other department heads; (2) hiring employees; (3) terminating employees; (4) training employees; (5) coordinating employee schedules; (6) providing a safe and clean work environment for employees; (7) maintaining confidentiality; (8) conducting weekly meetings with employees; (9) creating monthly sales and budget reports; (10) contributing to the development of an annual budget; (11) developing customer relationships; (12) coordinating and maintaining sufficient inventory; (13) providing quotes to commercial customers; and (14) advertising to and

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

---

[104] *Byers,* 110 F. Supp. 3d at 1283 ("However, where Plaintiffs down-play and minimize the importance of their positions, testifying that they spent most of their time performing routine non-managerial jobs, the courts have tended to reject such post-hoc efforts to minimize the relative importance of managerial duties."); *see also DePew*, 2006 WL 1663272 at *8 (citing *Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1334 (N. D. Ga. 2005)).

Classic Alaska's Memorandum in Support of Motion orummary Judgment          December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG          Page 32 of 47

attracting new corporate clients.[105]  Moreover, among other things, Scalf was responsible for setting employee wages,[106] conducting employee evaluations,[107] and approving employee vacations.[108]

Looking at Scalf's "job as a whole,"[109] Scalf's primary duty, or "principal value" to Classic, was the performance of her managerial responsibilities.  Like Blake, Scalf was not micromanaged by her superiors.[110]  Scalf was free to set her own schedule,[111] direct her own work,[112] and delegate any

---

[105] Ex. BT; *see also* Scalf Dep. 12:13-25; 13:14-23; 14:9-18; 21:11-14 ("Q. Terminating employees, right?  A.  There was none that was terminated, but okay.  Q. But you're saying – you described -- A.  I could do that.  Q. Right."); 21:23-25 (Q.  Training employees?  A.  There was some training that went on.  Q. Yeah.  A.  Uh-huh. . . . Q. Okay.  And then monitoring employees, right?  A.  Yes."); 29:6-15 ("But you were the manager of commercial sales and embroidery, correct?  A.  Sure.  Q.  Okay.  So these folks, when they worked in those departments, they didn't give you directions, did they?  A.  No.  Q.  You gave directions to them.  A.  Sure.  Right.  Because you're the manager, right?  A. Right."); 35:2-12 ("Q.  And the first bullet point, you described that you provided guidance and training for the embroidery supervisor and employees, right?  A.  Right."); 32:15-18 ("Q. [P]art of your job in the budgeting process was to make recommendations as to how the budget might be changed.  A. That's right."); 33:16-18 ("Q.  You would go meet with these commercial customers, give them quotes, and you'd take orders from them.  A. That's right."); 33:19-34:1 ("Q.  And then establishing new accounts and attracting potential customers by answering product and service questions, suggesting information . . . right?  A.  Yeah.  Q. Okay.  So that's sort of the calls on the customers – potential customers, to see if, in fact, they could be enticed to come do business with Big Ray's.  A. Correct."); 52:5-7 ("Q. So this is a form by which you evaluated Melani because she's an employee working for you, right?  A. Correct."); Exs. AQ-AS (Scalf's employee evaluation for Melani B.); Ex. BT (Client reference letters describing Scalf's independent role in developing and maintaining good relationships with Classic's corporate clients); Rostad Aff. ¶¶ 15-19, 24-38; Exs. AL-AZ, BA-BC; Baltrum Aff. ¶¶ 1-4.

[106] Rostad Aff. ¶¶ 29-30; Exs. AO and AP.

[107] Rostad Aff. ¶¶ 31-32; Exs. AQ-AS.

[108] Rostad Aff. ¶ 38; Ex. BC; *see also* Scalf Dep. at 66:13-20.

[109] 29 C.F.R. § 541.700(a) (2016).

[110] Rostad Aff. ¶ 24.

[111] Rostad Aff. ¶ 24.

[112] *Id.*; *see also* Scalf Dep. 29:6-15 ("But you were the manager of commercial sales and embroidery, correct?  A.  Sure.  Q.  Okay.  So these folks, when they worked in those departments, they didn't give you directions, did they?  A.  No.  Q.  You gave directions to them.  A.  Sure.  Right.  Because you're the manager, right?  A. Right.").

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment                    December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG                    Page 33 of 47

and all tasks as she deemed appropriate.[113]  Scalf was not instructed or required to perform any non-exempt work.[114]  To the extent Scalf did perform non-exempt work, it was the result of her own decision to perform that work in order to ensure the successful operation of Classic.[115]  At times, Scalf may have concurrently performed duties that could be characterized as both exempt and non-exempt, but Scalf never stopped supervising other employees while performing those non-exempt tasks.[116]  Thus, like Blake, although Scalf may have performed some "collateral tasks," her primary duty, and "principal value" to Classic, remained the performance of her managerial responsibilities.[117]

From at least 2011 through the end of her employment with Classic in June 2015, Scalf, as the Manager of the Embroidery Department and the Corporate Sales Department, "customarily and regularly" supervised at least two full-time employees who together worked an average of eighty hours per week.[118]  Melani B. was a full-time employee who worked under Scalf from before 2011 through June 2015.[119]  Ms. B. continues to work for Classic to this day.[120]  In addition to Ms. B., Scalf also hired other employees and supervised their work while they remained employed by Classic.  Although there was turnover of the employees who filled this second full-time position under Scalf, there was nonetheless regularly a second full-time employee working under Scalf, with only occasional gaps due

---

[113] Rostad Aff. ¶ 24.

[114] *Id.*; *see also* Scalf Dep. 29:6-15.

[115] Rostad Aff. ¶ 24.

[116] *Id.*

[117] *Id.*

[118] Benford Aff. ¶ 5.

[119] Benford Aff. ¶ 5.

[120] Benford Aff. ¶ 5.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 34 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 37 of 57

to turnover.[121]  At one point in time, from September 2014 to January 2015, Scalf had three full-time employees working under her.[122]  The employees who filled the second and third full-time positions under Scalf over time were as follows:[123]

| Employee 1 | Employee 2 | Employee 3 | Employee 4 | Dates | Note |
|---|---|---|---|---|---|
| Melani B. | Samantha A. | | | 10/4/2011 to 8/16/2013 | |
| Melani B. | | | | 8/17/2013 to 8/18/2013 | Searching for new employee |
| Melani B. | Teren W. | | | 8/19/2013 to 2/28/2014 | |
| Melani B. | | | | 3/1/2014 to 3/24/2015 | Searching for new employee |
| Melani B. | Amber M. | | | 3/25/2014 to 4/1/2014 | |
| Melani B. | | | | 4/2/2014 to 4/7/2014 | Searching for new employee |
| Melani B. | Monique B. | | | 4/8/2014 to 4/22/2014 | |
| Melani B. | | | | 4/23/2014 to 8/20/2014 | Searching for new employee |
| Melani B. | Marva B. | Nicole S. | | 8/21/2014 to 1/31/2015 | |
| Melani B. | Nicole S. | | | 2/1/2015 to 4/20/2015 | |
| Melani B. | Nicole S. | Raelene H. | | 4/21/2015 to 5/4/2015 | |
| Melani B. | Nicole S. | | | 5/5/2015 to 5/17/2015 | |
| Melani B. | Nicole S. | Franklene C. | Rene D. | 5/18/2015 to 5/30/2015 | |
| Melani B. | Franklene C. | Rene D. | | 5/31/2015 to 7/14/2015 | |

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska  99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

[121] Benford Aff. ¶ 5.

[122] Benford Aff. ¶ 5.

[123] Benford Aff. ¶ 5; Scalf Dep. 28:10-12 ("Okay.  So we've got about, one, two, three, four, five, six, seven or so people over the course of time, plus Melani, working under you?  A. Yes.").

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 35 of 47

Scalf always made more than the non-exempt employees working under her. Scalf earned $50,000 per year plus benefits in 2015, which equates to approximately $1,829.21 every two weeks (salary alone, not factoring in benefits). On an annual basis, the highest earning non-exempt employee under Scalf earned approximately $43,685 (or $1,680 bi-weekly) in 2015.[124] Accordingly, Scalf was paid more than the non-exempt employees working under her. Finally, Scalf had authority to hire and fire employees.[125] During the course of her employment, Scalf hired nine employees[126] and fired one employee.[127] Scalf set the hourly wages for each employee she hired.[128] Scalf also gave employees pay raises.[129] Scalf made these hiring, firing, and payroll decisions on her own, perhaps sometimes asking for advice or opinions, but never requiring approval from anyone over her.[130] There was never an instance where Rostad, or any other Classic owner overrode or countermanded Scalf's decisions regarding hiring, firing, or promotion.[131] Again, while there is no dispute that Scalf was not the Chief Executive Officer of Classic, Scalf, as a manager, performed her primary managerial role with significant authority, discretion, and autonomy. Scalf was unquestionably an exempt executive employee.

---

[124] Benford Aff. ¶ 4.

[125] *See supra* p. 34, n.105.

[126] *See* Benford Aff. ¶ 5; *see also* Rostad Aff. ¶ 29.

[127] *See* Rostad Aff. ¶ 27; Ex. AM.

[128] *See* Rostad Aff. ¶ 29; *see also* Ex. AO.

[129] *Id.*

[130] Rostad Aff. ¶¶ 29-30; Exs. AO and AP.

[131] Rostad Aff. ¶ 27.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 36 of 47

**B.** **Alternatively, Blake and Scalf Were Both Exempt Administrative Employees Who Were Not Entitled to Overtime Pay.**

**1. Legal Standard for Exempt Administrative Employees.**

Under the AWHA and FLSA, for the time period relevant to this dispute, an employee qualifies for the "bona fide administrative" exemption if:

(1) the employee is "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week;"

(2) their "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and

(3) their "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."[132]

As discussed above, Factor 1 is not in dispute. Blake and Scalf were undeniably compensated on a salary basis at a rate of not less than $455 per week.[133] Rather, the focus of the parties' dispute is whether Blake and Scalf satisfied factors 2 – 3 of the administrative exemption test.

**a. Primary Duty.**

The term "primary duty" under the administrative exemption carries the same definition that it does for the executive exemption.[134] The only difference between the two standards is "that with the executive exemption, the primary duty must be management and with the administrative exemption,

---

[132] 29 C.F.R. § 541.200(a) (2016); *see* AS 23.10.055(c)(1); *Moody v. Royal Wolf Lodge*, 339 P.3d 636, 639 n.15 (Alaska 2014) (Explaining that in 2005 the Alaska Legislature amended the AWHA to adopt the federal definitions of "administrative," "executive," and "professional" employees.).

[133] *See supra* pp. 12-13; Scalf Dep. 60:17-22.

[134] *See* 29 C.F.R. § 541.200(b) ("The term . . . "primary duty" is defined in § 541.700."); 29 C.F.R. § 541.700; *see also Rooney v. Town of Groton*, 577 F. Supp. 2d 513, 528 (D. Mass. 2008) (citing *Pendlebury v. Starbucks Coffee Co.*, No. 04-80521-CIV, 2008 WL 763213 at * 9 (S. D. Fla. Mar. 13, 2008) ("The term 'primary duty' under [the administrative] exemption carries the same definition that it does for the executive exemption.")).

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 37 of 47

the primary duty must be related to assisting with the running of the business."[135]  Accordingly, the primary duty analysis detailed above also applies to the analysis of whether Blake and Scalf were exempt administrative employees.[136]

### b. Office Work Directly Related to Management or General Business Operations.

The administrative exemption only applies if the employee's primary duty includes the "performance of work directly related to the management or general business operations of the employer of the employer's customers."[137]  This requirement can be satisfied by the employee performing "work directly related to assisting with the running or servicing of the business."[138]  This requirement cannot be satisfied by a mere showing that the employee's responsibilities were equivalent to "working on a manufacturing production line or selling a product in a retail or service establishment."[139]

DOL's regulations provide a non-exhaustive list of exempt administrative operations, which includes "work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations,

---

[135] *Rooney*, 577 F. Supp. 2d at 528; *compare* 29 C.F.R. §541.100(a)(2) (2016) *with* 29 C.F.R. § 541.200(a)(2),(3) (2016); 29 C.F.R. § 541.700 (2016).

[136] *See supra* pp. 19-29.

[137] 29 C.F.R. § 541.201(a) (2016).

[138] 29 C.F.R. § 541.201(a) (2016).

[139] 29 C.F.R. § 541.201(a) (2016).

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 38 of 47

government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities."[140]

### c. Discretion and Independent Judgment Regarding Matters of Significance.

The administrative exemption also requires that the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."[141] The exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."[142] DOL's regulations provide a non-exhaustive list of factors to consider when determining whether this requirement is satisfied:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

[140] 29 C.F.R. § 541.201(b) (2016).

[141] 29 C.F.R. § 541.200(a)(3); *see Bailey v. Alpha Techs. Inc.*, No. C16-0727-JCC, 2017 WL 4167929 at *6 (W.D.Wash. Sept. 9, 2017).

[142] 29 C.F.R. § 541.202(a) (2016).

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 39 of 47

Further, "to exercise discretion and independent judgment, an 'administrative' employee must meet at least two or three of these factors."[143]

Notably, "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level."[144]  Indeed, "the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review."[145]  Rather, '[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action."[146]

### 2.  Blake Was an Exempt Administrative Employee.

Blake was compensated on a salary basis at a rate of more than $455 per week.  Blake's "primary duty was the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  Blake's job function that was of principal value to Classic was her managerial actions overseeing and running the two departments under her direction and control.  The evidence is overwhelming that Blake's most important function to Classic was not the collateral tasks that she may have also performed, even if it were assumed that they consumed more than half her time.  Indeed, the principal, main, major, or most important duty that Blake performed was managing the two departments under her direction and

---

[143] *Quintilliani v. Concentric Healthcare Sols., LLC*, 944 F. Supp. 2d 738, 744 (D. Ariz. 2013) (citing Dep't of Labor Wage & Hour Div., Rules and Regulations, 69 Fed.Reg. 22122, 22143 (Apr. 23, 2004)).

[144] 29 C.F.R. § 541.202(c) (2016); *see Blanchar v. Standard Ins. Co.*, 736 F.3d 753, 757-58 (7th Cir. 2013).

[145] 29 C.F.R. § 541.202(c) (2016).

[146] 29 C.F.R. § 541.202(c) (2016).

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 40 of 47

control. Blake plainly spent a great deal of time managing her two departments. Blake's exempt duties managing her two departments, as compared with other types of duties, were extremely significant and important to Classic. Blake was free from direct supervision. Blake was paid significantly more than the employees working under her supervision and control.

Blake's work involved the performance of work directly related to assisting with the running or servicing of Classic's business. Classic's stores in Fairbanks were under Blake's direct supervisory control. Consistent with the DOL's regulations, Blake's work responsibilities fit into exempt administrative work with respect to budgeting; quality control; advertising; marketing; safety and health; personnel management; public relations, government relations; and similar activities.[147] Blake exercised discretion and independent judgment with respect to matters of significance for Classic.[148] Blake had authority to formulate, effect, interpret, or implement management policies or operating practices, and she did this on a regular basis in her interaction with employees under her supervision.[149] Blake performed work that affected Classic's business operations to a substantial degree—the

---

[147] Rostad Aff. ¶ 3-6, 8-14, 19-20, 24, 26-27; Glamann Aff. ¶¶ 4-6, 9-36; Exs. B, E-Z, AA-AG. Blake oversaw all of Classic's customer services and facilities operations in Classic's Fairbanks stores and catalog and web sales. Glamann Aff. ¶ 5. Blake hired and fired and disciplined employees. *Id.* ¶ 6. She set, tracked and made sure Classic's operations under her management met goals and she held employees under her supervision accountable for meeting goals. *Id.* She defined and implemented standards and procedures and she held employees accountable for adherence to standards and procedures. *Id.*; Rostad Aff. ¶ 9. Blake maintained standards for the proper handling of inventory processed through orders in her departments. Glamann Aff. ¶ 6. Blake implemented and managed loss-prevention strategies and processes. *Id.* Blake coordinated catalog and web development for Classic's advertising and catalog/web sales. *Id.* Blake enforced Classic company policy with employees. Blake Dep. 64-65. Blake made recommendations that were given significant credit regarding staffing and she assigned staffing for her departments. Blake Dep. 81-84. Blake approved vacation and other time-off requests by employees working under her. Rostad Aff. ¶ 12.

[148] Rostad Aff. ¶¶ 3-6, 8-14, 19, 24; Glamann Aff. ¶¶ 4-6, 9-36; Exs. B, E-Z, AA-AG; Blake Dep. 61-62 (Blake took responsibility and authority to hire security for Classic's tent sale).

[149] Rostad Aff. ¶¶ 3-6, 8-24; Glamann Aff. ¶¶ 4-6, 9-36; Exs. B, E-Z, AA-AG.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment                    December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG                    Page 41 of 47

departments assigned to Blake had operating budgets approaching $1 million.[150] Blake was involved in planning long- or short-term business objectives—specifically with respect to the annual budget for her two departments that approached $1 million.[151] Blake investigated and resolved matters of significance on behalf of management with respect to personnel under her supervision.[152]

### 3. Scalf Was an Exempt Administrative Employee.

Scalf was compensated on a salary basis at a rate of more than $455 per week. As demonstrated above, Scalf's "primary duty was the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." Scalf's job function that was of principal value to Classic was her managerial actions overseeing and running the Corporate Sales (and Embroidery) department under her direction and control.[153] Scalf's most important function to Classic was not the collateral tasks that she may have also performed, even if it were assumed that they consumed more than half her time.[154] Indeed, the principal, main, major or most important duty that Scalf performed was managing the department under her direction and control.[155] Scalf plainly spent a great deal of time managing her department. Scalf's exempt duties managing her two departments, as compared with other types of duties, were extremely significant and important to Classic.[156]

---

[150] Rostad Aff. ¶¶ 3-6, 8-13, 19; Glamann Aff. ¶¶ 4-6, 9-36; Exs. B, E-Z, AA-AG.

[151] Rostad Aff. ¶ 13; Glamann Aff. ¶¶ 39-40; Exs. AJ-AK, BS.

[152] Glamann Aff. ¶ 29-30, 32-36; Exs. Z, AA, AC-AG; Blake Dep. 45, 59.

[153] Rostad Aff. ¶ 24.

[154] *Id.*

[155] *Id.*

[156] *Id.*

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 42 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 45 of 57

Scalf's work involved the performance of work directly related to assisting with the running or servicing of Classic's business. Classic's corporate sales and related embroidey business were under Scalf's direct supervisory control.[157] Consistent with the DOL's regulations, Scalf's work responsibilities fit into exempt administrative work with respect to budgeting; quality control; advertising; marketing; safety and health; personnel management; public relations, government relations; and similar activities.[158] Scalf exercised discretion and independent judgment with respect to matters of significance for Classic.[159] Specifically, Scalf had authority to formulate, effect, interpret, or implement management policies or operating practices, and she did this on a regular basis in her interaction with employees under her supervision.[160] Scalf performed work that affected Classic's business operations to a substantial degree—the departments assigned to Scalf had significant operating budgets.[161] Scalf had authority to negotiate and commit Classic to corporate discount contracts within a certain preapproved range.[162] Scalf was involved in planning long- or short-term business

---

[157] *See supra* at pp. 34-39 and n.105.

[158] *See supra* at pp. 34-39 and n.105. ; *see also* Rostad Dep. 44:4-23; 45:21-46:3 (Testifying that while ownership ultimately made decisions regarding the range of discounts to offer new and existing corporate clients, ownership solicited and considered input from Scalf and other managers in the Corporate Sales Department. Moreover, Scalf had discretion to offer discounts within the range of discounts approved by ownership).

[159] 29 C.F.R. § 541.202(b).

[160] *See supra* at pp. 34-39 and n.105; *see also* 29 C.F.R. § 541.202(b).

[161] *See supra* at pp. 34-39 and n.105; *see also* Rostad Dep.42:25-43:11 (Explaining that corporate customers make up about one third of Classic's business); 29 C.F.R. § 541.202(b).

[162] *See supra* Scalf Dep. 15:5-21 (would negotiate and close contracts with more sophisticated corporate customers); Scalf Dep. 17:8-15 (signed corporate contracts); Exs. AT-AX; Scalf Dep. 18:12-16 ("Q. So part of what you're describing in your skills were the ability to go out to potential commercial customers, tell them what Big Ray's had to offer, and see if you could get them to come and sign a contract. A. Sure."); 33:15-34:1 (would advertise and negotiate with potential corporate clients); 29 C.F.R. § 541.202(b).

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment            December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG            Page 43 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 46 of 57

objectives—specifically with respect to the annual budget for her department.[163]  And, Scalf investigated and resolved matters of significance on behalf of management with respect to personnel under her supervision.[164]  Accordingly, Scalf's primary duty was the performance of administrative work and she is thus exempt from the overtime requirements of the FLSA and AWHA.

### C. Alternatively, Blake and Scalf Are Exempt Employees Under the Combination Exemption.

In addition to the individual exemptions discussed above, the DOL's regulations provide for a hybrid "combination exemption."[165]  "The combination exemption addresses the situation in which an 'employee perform[s] duties that fall under more than one individual exemption, none of which separately represents her primary duty.'"[166]  Specifically, the combination exemption provides:

> Employees who perform a combination of exempt duties as set forth in the regulations in this part for executive, administrative, professional, outside sales and computer employees may qualify for exemption. Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption. In other words, work that is exempt under one section of this part will not defeat the exemption under any other section.[167]

As the Fourth Circuit explained, "the combination exemption provides a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test."[168]

As discussed above, Blake's and Scalf's primary duties qualify them for exemption under both the executive and administrative exemptions.  However, to the extent Blake's and Scalf's primary

---

[163] *See supra* at pp. 34-39 and n.105; *see also* 29 C.F.R. § 541.202(b).

[164] *See supra* at pp. 34-39 and n.105; *see also* 29 C.F.R. § 541.202(b).

[165] 29 C.F.R. § 541.708 (2017).

[166] *Schmidt v. Eagle Waste & Recycling, Inc.*, 598 F. Supp. 2d 928, 937 (W. D. Wis. 2009) (quoting *IntraComm, Inc. v. S. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007)).

[167] 29 C.F.R. § 541.708 (2017).

[168] *Schmidt,* 598 F. Supp. 2d at 937 (quoting *IntraComm, Inc.,* 492 F.3d at 294).

BRENA, BELL & CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone:  (907) 258-2000
Facsimile:  (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment                    December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG              Page 44 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 47 of 57

duties are found to be a mixture of exempt managerial and administrative tasks, rather than one or the other individually, Blake and Scalf would still qualify for exemption under the combination exemption.

### D. Classic Alaska's Compensation of Blake and Scalf Did Not Violate the Implied Covenant of Good Faith and Fair Dealing.

Alaska law implies a covenant of good faith and fair dealing into every employment contract.[169] "The covenant does not have a precise definition, but generally requires employers to treat like employees alike and act in a manner that a reasonable person would regard as fair."[170] The covenant has two primary components: (1) the subjective component, which "prohibits an employer from terminating an employee for the purpose of depriving the employee of the contract's benefits;" and (2) the objective component, which "prohibits . . . dealing with the employee in a manner that a reasonable person would regard as unfair."[171] The subjective component of the implied covenant hinges on the "employer's motives."[172] To prevail, an employee must present proof that the employer acted to deprive an employee unfairly "of a benefit contemplated by the employment contract."[173] In contrast, the objective component weighs whether there was disparate employee treatment, discharge on unconstitutional grounds, or a violation of public policy.[174] "[T]here is no

---

[169] *Crowley v. State, Dep't of Health & Soc. Servs.*, 253 P.3d 1226, 1230 (Alaska 2011).

[170] *Mitchell v. Teck Cominco Alaska Inc.,* 193 P.3d 751, 760–61 (Alaska 2008) (internal citations omitted); *see also Crowley*, 253 P.3d at 1230.

[171] *Mitchell*, 193 P.3d at 761.

[172] *Pitka v. Interior Reg'l Hous. Auth.*, 54 P.3d 785, 789 (Alaska 2002) (internal citations omitted).

[173] *Era Aviation, Inc. v. Seekins,* 973 P.2d 1137, 1139 (Alaska 1999).

[174] *Pitka*, 54 P.3d at 789.

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment     December 1, 2017
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG     Page 45 of 47

breach of the implied covenant . . . even if the employee could subsequently prove that the [employer's] factual finding of misconduct [in support of a termination decision] was a mistake."[175]

Here, Classic took no adverse employment action against Blake or Scalf and did not terminate either of them from employment. Blake and Scalf both left employment with Classic of their own voluntary accords. And, neither Blake nor Scalf make a claim in their respective complaints that Classic took adverse employment action against them or terminated their employment. [*See* Blake DK 1] Both Blake and Scalf base their respective good-faith and fair-dealing claims upon nothing other than the allegation that Classic failed to pay them required overtime and pay upon separation. [Blake DK 1 ¶ 38; Scalf DK 1 ¶ 38] Neither Blake nor Scalf claim that Classic acted to unfairly deprive them of a benefit of their respective employment contracts. To the contrary, Blake and Scalf claim that, despite Classic having paid them their contracted salaries, Classic improperly failed to pay them statutory overtime compensation allegedly due under the FLSA and the AWHA. [Blake DK 1 ¶¶ 7-12, 38, Scalf DK 1 ¶¶ 7-12, 38] Blake and Scalf were both employed by Classic on contracted salaries as exempt managerial employees.

Even assuming that Classic violated overtime laws by failing to pay Blake and Scalf overtime compensation—which it did not given their exempt status—those statutory violations would not constitute a breach of the implied covenant. Blake and Scalf cannot bootstrap an implied covenant claim out of a failure to pay overtime compensation. Blake and Scalf have not alleged that Classic performed under their employment contracts in ways that were unfaithful to the purpose of the employment contracts, but rather that, despite Classic's adherence to their employment contracts,

---

[175] *Willard v. Khotol Servs. Corp.,* 171 P.3d 108, 116 (Alaska 2007).

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 46 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 49 of 57

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile (907) 258-2001

statutory law required that they be paid overtime compensation. These types of allegations do not give rise to a claim for breach of the implied covenant of good faith and fair dealing.[176]

## VII.    CONCLUSION

For all the foregoing reasons, the Court should grant Classic summary judgment dismissing all of Blake's and Scalf's claims with prejudice.

DATED this 1st day of December, 2017.

BRENA, BELL & CLARKSON, P.C.
Attorneys for Defendant

By _____
Kevin G. Clarkson, ABA No. 8511149
Matthew C. Clarkson, ABA No.1111077

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

---

[176] *See Andreatta v. Eldorado Resorts Corp.*, 214 F. Supp. 3d 943, 956-57 (D. Nev. 2016).

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 47 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 50 of 57

**Certificate of Service**
The undersigned hereby certifies that
a copy of the foregoing document was
e-mailed to the following attorneys/
parties of record on the 1st day of
December, 2017:

**Attorneys for Plaintiff**
H. Van Z. Lawrence, Esq.
751 Seventh Avenue, Suite B
Fairbanks, Alaska 99701
E-Mail:        hvzlaw@gmail.com


Avonna L. Murfitt

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile (907) 258-2001

Classic Alaska's Memorandum in Support of Motion orummary Judgment
*Blake v. Classic* Alaska Trading/Big Rays, Case No. 4:16-cv-00005SLG

December 1, 2017
Page 48 of 47

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 51 of 57

## INDEX TO EXHIBITS TO MOTION FOR SUMMARY JUDGMENT

| EXHIBIT | DESCRIPTION |
|---|---|
| Exhibit A | Classic's Organizational Chart (Bates No. Classic-Blake002308). |
| Exhibit B | Job Description for Suzanne Blake's manager positions with Classic (Bates No. Classic-Blake000103-104). |
| Exhibit C | Job Description for Catherine Scalf's manager position with Classic (Bates No. Classic-Blake002312). |
| Exhibit D | Suzanne Blake's Summary of Employment Terms with Classic (Bates No. Classic000088-89). |
| Exhibit E | Email from Suzanne Blake to Jesse Glamann dated July 31, 2014, regarding firing employees (Bates No. Classic-Blake000512). |
| Exhibit F | Termination Report dated September 23, 2013, reflecting that Suzanne Blake fired Mischelle J. (Bates No. Classic-Blake002342). |
| Exhibit G | Email from Suzanne Blake to Jesse Glamann dated September 21, 2013, regarding staff-related personnel matters (Bates No. Classic-Blake000249). |
| Exhibit H | Termination Report dated October 31, 2013, reflecting that Blake fired Trisha P. (Bates No. Classic-Blake002342). |
| Exhibit I | Termination Report dated November 11, 2013, reflecting that Suzanne Blake laid-off Mary F. (Bates No. Classic-Blake002341). |
| Exhibit J | Termination Report dated December 5, 2013, reflecting that Suzanne Blake fired Bret B. (Bates No. Classic-Blake002342). |
| Exhibit K | Termination Report dated December 23, 2013, reflecting that Suzanne Blake accepted Yamil M.'s resignation (Bates No. Classic-Blake002348). |
| Exhibit L | Termination Report dated January 27, 2014, reflecting that Suzanne Blake fired Heather V. (Bates No. Classic-Blake002337). |
| Exhibit M | Termination Report dated January 29, 2014, reflecting that Suzanne Blake fired Ryan C. (Bates No. Classic-Blake002119). |
| Exhibit N | Termination Report dated January 30, 2014, reflecting that Suzanne Blake fired Jessica R. (Bates No. Classic-Blake002339). |

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

| | |
|---|---|
| Exhibit O | Email from Suzanne Blake to Jesse Glamann dated December 2-3, 2013, regarding personnel matters with respect to Jessica R. (Bates No. Classic-Blake000281-282). |
| Exhibit P | Termination Report dated January 30, 2014, reflecting that Suzanne Blake fired Teresa N. (Bates No. Classic-Blake002344). |
| Exhibit Q | Termination Report dated March 3, 2014, reflecting that Suzanne Blake approved the decision to fire Laurie W. (Bates No. Classic-Blake002340). |
| Exhibit R | Termination Report dated April 21, 2014, reflecting that Suzanne Blake fired Donna T. (Bates No. Classic-Blake002336). |
| Exhibit S | Termination Report dated May 9, 2014, reflecting that Suzanne Blake fired Roary H. (Bates No. Classic-Blake002343). |
| Exhibit T | Termination Report dated July 1, 2014, reflecting that Suzanne Blake fired Alesha D. (Bates No. Classic-Blake002332). |
| Exhibit U | Termination Report dated August 25, 2014, reflecting that Suzanne Blake fired Vanessa H. (Bates No. Classic-Blake002346). |
| Exhibit V | Termination Report dated September 12, 2014, reflecting that Suzanne Blake fired Dawn H. (Bates No. Classic-Blake002335). |
| Exhibit W | Employee Warning Notice dated August 7, 2014, that Suzanne Blake issued to John C. (Bates No. Classic-Blake002331). |
| Exhibit X | Employment contracts for 29 employees that Suzanne Blake hired to work for Classic within her departments between September 2013 and September 2014 (Bates Nos. Classic-Blake002350-56, 2358, 2360, 2362-68, 237076, 2378, 2380, 2383-84, 2386-87). |
| Exhibit Y | Emails by Suzanne Blake announcing and discussing people that she had hired to work within her departments at Classic (Bates Nos. Classic-Blake002349, 2357, 2359, 2361, 2369, 2377, 2379, 2382, 2385). |
| Exhibit Z | Email from Suzanne Blake to Jesse Glamann dated November 16, 2013, regarding actions she had taken to address the problem of employees giving unauthorized discounts to customers (Bates No. Classic-Blake000267). |
| Exhibit AA | Staffing chart that Suzanne Blake prepared on June 12, 2014, assigning days and hours of work to the employees working under her supervision with respect to the annual Midnight Sun Festival (Bates No. Classic-Blake001967). |

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Exhibit List                                                    December 1, 2017
*Blake v. Classic Alaska Trading/Big Rays,* Case No. 4:16-cv-00005-SLG                Page 2 of 6

Case 4:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 53 of 57

| | |
|---|---|
| Exhibit AB | Sixteen time off request forms that Suzanne Blake signed as Manager for multiple employees in her departments (Bates Nos. Classic-Blake002079, 2083, 2085, 2087-89, 2092, 2095, 2099-101, 2112, 2123, 2124, 2126). |
| Exhibit AC | Email from Suzanne Blake to Jesse Glamann dated October 18, 2013, explaining her plans with respect to the wages, assignments, and hours of employees working under her direction, supervision, and control (Bates No. Classic-Blake000600). |
| Exhibit AD | Twenty-four wage change forms for Classic employees working within the departments that Suzanne Blake managed (Bates Nos. Classic-Blake0072, 2076-78, 2082, 2084, 2086, 2109-11, 2120, 2122, 2387-97). |
| Exhibit AE | Email from Suzanne Blake dated February 5, 2014, to employees working under her supervision, direction, and control, instructing them regarding Company policy on employees having friends visiting them in the store during work hours (Bates No. Classic-Blake000336). |
| Exhibit AF | Emails from Suzanne Blake to Jesse Glamann and her employees dated June 5 and 13, 2014, discussing dress-code issues for employees working under her regarding dress code (Bates No. Classic-Blake000470, 475). |
| Exhibit AG | Email dated June 11, 2014, from Suzanne Blake to Jesse Glamann and employees working under her within her departments, and copied to me, regarding work breaks (Bates No. Classic-Blake000471). |
| Exhibit AH | Time change request forms signed by Suzanne Blake as manager for employees working under her supervision, direction, and control Judgment (Bates Nos. Classic-Blake002080, 2093, 2098, 2102-07, 2113-18, 2125, 2127-28). |
| Exhibit AI | Classic credit nomination forms and an email reflecting Suzanne Blake's decisions and actions to recognize employees working in her departments with awards in the form of bonuses (Bates Nos. Classic-Blake002327, 2329-30). |
| Exhibit AJ | Email from Suzanne Blake to Jesse Glamann dated November 28, 2013, with the budget that she had completed for her departments for the upcoming year of 2014 (Bates No. Classic-Blake000661-63). |
| Exhibit AK | Email from Suzanne Blake to Jesse Glamann dated December 30, 2013, informing me that she had cut her proposed budget for her departments NO BATES*** |

BRENA, BELL & CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Exhibit List                                                                December 1, 2017
*Blake v. Classic Alaska Trading Co.*, Case No. 2:16-cv-00005-SLG               Page 3 of 6
Case 3:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 54 of 57

| | |
|---|---|
| Exhibit AL | Termination Report dated May 28, 2015, reflecting that Catherine Scalf received and accepted the resignation of Nicole S. a sales specialist working under her in the Corporate Sales Department, a department that she managed (Bates No. Classic-Scalf001027). |
| Exhibit AM | Termination Report dated May 4, 2015, reflecting that Catherine Scalf fired Raelene H. a Corporate Sales Specialist working in the Corporate Sales Department under Catherine Scalf as manager (Bates No. Classic-Scalf006460). |
| Exhibit AN | Termination Report dated February 6, 2015, reflecting that Catherine Scalf accepted Marva B.'s resignation (Bates No. Classic-Scalf001026). |
| Exhibit AO | Payroll Change Form dated January 29, 2014, regarding Melani Baltrum that is signed by Catherine Scalf (under her then-name of Cathy Gerlinger), as the Manager of the Embroidery Department (Bates No. Classic-Scalf001035). |
| Exhibit AP | Payroll Change Form dated September 17, 2014, regarding Nicol S. that is signed by Catherine Scalf (Bates No. Classic-Scalf006461). |
| Exhibit AQ | Employee Evaluation Form, dated January 29, 2014 regarding Melani Baltrum that was filled out by Catherine Scalf as the Manager of Embroidery Department (Bates No. Classic-Scalf001029-1034). |
| Exhibit AR | Employee Evaluation Form, dated February 19, 2015, regarding Melani Baltrum that was filled out by Catherine Scalf as the Manager of Embroidery Department (Bates No. Classic-Scalf000863-868). |
| Exhibit AS | Classic Credit Nomination Form that Catherine Scalf completed regarding Melani Baltrum, an employee working within the Embroidery Department under Catherine Scalf's supervision as the Department Manager (Bates No. Classic-Scalf001041). |
| Exhibit AT | Letter that Catherine Scalf sent to a Classic customer or potential customer as the Manager of Corporate Sales (Bates No. Classic-Scalf001082). |
| Exhibit AU | Corporate Agreements that Catherine Scalf executed with Classic customers on behalf of Classic (Bates No. Classic-Scalf001090-1107, 1114-16, 1120-28, 1130-38). |
| Exhibit AV | Response to a request for quote from the Fairbanks North Star Borough that Catherine Scalf prepared and submitted to the Borough on behalf of Classic (Bates No. Classic-Scalf000123-129). |

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Exhibit List                                                    December 1, 2017
Blake v. Classic Alaska Trading Co., Case No. 2:16-cv-00005-SLG          Page 4 of 6
Case 2:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 55 of 57

| | |
|---|---|
| Exhibit AW | Email from a procurement officer for the State of Alaska, Department of Transportation and Public Facilities confirming that DOT&PF had awarded a contract for coveralls to Classic based upon a bid that Catherine Scalf prepared and submitted to DOT&PF on behalf of Classic (Bates No. Classic-Scalf000132). |
| Exhibit AX | Bid that Catherine Scalf submitted to DOT&PF on January 17, 2014, on behalf of Classic (Bates No. Classic-Scalf00033-36). |
| Exhibit AY | Supplier's Assertion of Commerciality that Catherine Scalf submitted on December 11, 2014, as Corporate Sales Manager on behalf of Classic to Northrup Grumman as a customer regarding items that Scalf had bid to sell to the customer on work the customer was performing for the Federal Government (Bates No. Classic-Scalf000750-751). |
| Exhibit AZ | Annual Summit Report that Scalf prepared and submitted for 2013 **NO BATES** |
| Exhibit BA | Monthly Dairy that Scalf prepared regarding her Corporate Sales Department for November 2014 (Bates No. Classic-Scalf000083-85). |
| Exhibit BB | Monthly Dairy that Scalf prepared regarding her Corporate Sales Department for September 2014 (Bates No. Classic-Scalf000613-614). |
| Exhibit BC | Time Off Request form that Scalf signed on July 30, 2010, reflecting that she approved time off for Melani Baltrum (Bates No. Classic-Scalf001036). |
| Exhibit BD | Email from Suzanne Blake to Jesse Glamann dated September 21, 2013, complaining about Ryan C. (Bates No. Classic-Blake000249). |
| Exhibit BE | Email from Suzanne Blake to Cindy Benford, Eileen F., and Monty Rostad dated December 5, 2013, indicating that she had fired an employee named Bret B. (Bates No. Classic-Blake002333). |
| Exhibit BF | Email from Suzanne Blake to Eileen F. dated October 26, 2013, indicating that she had hired an employee named Mary F. and set her starting pay rate (Bates No. Classic-Blake002328). |
| Exhibit BG | Email from Suzanne Blake to Melinda W. dated April 16, 2014, indicating that she had hired an employee named Roary H. (Bates No. Classic-Blake002377). |
| Exhibit BH | Email from Suzanne Blake to Melinda W. dated April 16, 2014, indicating that she was in the process of hiring employees and was preparing to interview a potential employee named Donna T. (Bates No. Classic-Blake002361). |

BRENA, BELL &
CLARKSON, P C
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Exhibit List                                                                December 1, 2017
*Blake v. Classic Alaska Trading (Big Ray's), Case No. 2:16-cv-00005-SLG*         Page 5 of 6
Case 2:16-cv-00005-SLG   Document 92   Filed 12/01/17   Page 56 of 57

| Exhibit BI | Email from Suzanne Blake to Cindy Benford dated April 12, 2014, indicating that she was in the process of hiring employees and had in fact hired two employees (Bates No. Classic-Blake002385). |
| --- | --- |
| Exhibit BJ | Email from Suzanne Blake to Cindy Benford dated August 13, 2014, indicating that she had hired a new employee named Laverne H. and had assigned her to work at a particular store in Fairbanks under Blake's management (Bates No. Classic-Blake002369). |
| Exhibit BK | Email from Suzanne Blake to Cindy Benford dated August 20, 2014, indicating that she had hired a new employee named Dakota M. (Bates No. Classic-Blake002357). |
| Exhibit BL | Email from Suzanne Blake to Cindy Benford dated August 22, 2014, indicating that she had hired a new employee named Aeria Y. (Bates No. Classic-Blake002349). |
| Exhibit BM | Email from Suzanne Blake to Cindy Benford dated August 25, 2014, indicating that she had hired three new employees named Tanya E., Kirai B., and Cheryl W. (Bates No. Classic-Blake002382). |
| Exhibit BN | Email from Suzanne Blake to Cindy Benford dated August 27, 2014, indicating that she had hired a new employee named Dawn H. (Bates No. Classic-Blake002359). |
| Exhibit BO | Email from Suzanne Blake to Cindy Benford dated September 24, 2014, indicating that she had hired a new employee named Shania C. (Bates No. Classic-Blake002379). |
| Exhibit BP | Emails from Suzanne Blake to Jesse Glamann dated March 4, 2014 regarding staffing levels including Excel spreadsheet (Bates No. Classic-Blake000370, 381). |
| Exhibit BQ | Email from Suzanne Blake to Jesse Glamann dated December 2, 2013 regarding problems with employees, Bret B. and Jessica R (Bates No. Classic-Blake000281-82). |
| Exhibit BR | Email from Suzanne Blake to Jesse Glamann and Cindy Benford dated July 17, 2014 regarding firing MaryLou Z (Bates No. Classic-Blake000502-03). |
| Exhibit BS | Email from Suzanne Blake to Jesse Glamann dated March 4, 2014 regarding daily schedule spreadsheet (Bates No. 000370). |
| Exhibit BT | Resume of Catherine "Gerlinger" Scalf (Bates No. Classic-Scalf000176-83). |

BRENA, BELL &
CLARKSON, P C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Classic Alaska's Exhibit List                                                     December 1, 2017
*Blake v. Classic Alaska Trading Dba Big Rays*, Case No. 2:16-cv-00005/SLG        Page 6 of 6
Case 1:16-cv-00005-SLC   Document 92   Filed 12/01/17   Page 57 of 57